## A. B. SMALL COMPANY *v.* AMERICAN SUGAR REFINING COMPANY.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF GEORGIA.

No. 101.   Argued October 22, 1924.—Decided March 2, 1925.

1. Written orders for goods, addressed to a sugar refiner, and written acceptances by the latter, compared and construed, in the light of the parties' conduct, and *held* free from variances alleged to prevent their forming completed contracts. P. 235.

2. In construing a typewritten document, a mistake of the typist by transferring the concluding clause of one sentence to the beginning of the next, thus altering the literal meaning, may be corrected to conform to the context and the sense of the whole and to the conduct of the parties. P. 236.

3. Section 4 of the Act of August 10, 1917, amended October 22, 1919, known as the Lever Act, which provides that it shall be "unlawful for any person wilfully . . . to make any unjust or unreasonable . . . charge in . . . dealing in or with any necessaries," or to agree with another " to exact excessive prices for

any necessaries," and which has been adjudged violative of the due process clause of the Fifth Amendment as applied to criminal prosecutions, (*United States* v. *Cohen Grocery Co.* 255 U. S. 109,) is likewise invalid as a test of the validity of a contract for the sale of a commodity (e. g. sugar,) because in either case the standard of duty set up is so vague and indefinite as really to be no rule or standard at all. *Levy Leasing Co.* v. *Siegel,* 258 U. S. 242, distinguished. P. 237.

4. Section 5 of the Lever Act did not invest the President with general authority to fix the profit which might be taken on sales of sugar, but only with special authority, on finding that a licensee was taking an unreasonable profit, to require that such practice on the part of the licensee be discontinued and to determine what was a reasonable profit to be taken in place of the one condemned. P. 242.

5. Section 6 of the Lever Act, though prohibiting wilful hoarding and also certain acts done for the purpose of unreasonably increasing or diminishing prices, did not prohibit a selling for delivery more than 30 days in the future. P. 243.

6. The duty of a seller upon retaking goods for sale on the buyer's account is to make the resale fairly in a reasonably diligent effort to obtain a good price. P. 244.

7. Evidence, on the part of the buyer, of particular sales of like goods by others at higher prices than that obtained by the seller's resale of the goods in question, *held* rightly excluded from the jury, both because the seller was not obliged to obtain the best price possible, and because the other sales, due to circumstances disclosed, did not tend to establish a standard by which the fairness of the resale could be judged. *Id.*

8. The duty of a seller to resell goods under a vendor's lien does not arise until he takes possession under it; and the reasonable time permitted for reselling does not begin to run until then. P. 246.

Affirmed.

ERROR to a judgment of the District Court recovered by the plaintiff in an action upon two contracts for the sale of sugar, which the defendant broke by refusing to accept the sugar when delivered.

*Mr. Edgar Watkins,* with whom *Mr. Frederick T. Saussy, Mr. Mac Asbill* and *Mr. Horace Russell* were on the brief, for plaintiff in error.

*Mr. Orville A. Park,* with whom *Mr. J. F. Abbott* and *Mr. Ralph Crews* were on the brief, for defendant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was an action to recover for the breach of two contracts for the sale by a sugar refiner to a wholesale dealer of 35,000 pounds of refined sugar—the breach consisting in the buyer's refusal to accept the sugar when delivered. The plaintiff secured a verdict and judgment in the District Court; and the defendant prosecutes this direct writ of error, a constitutional question, among others, being involved.

The contracts were alleged to have arisen out of written orders from the wholesale dealer and written acceptances by the refiner. Whether the acceptances conformed to the orders, and so resulted in contracts, was questioned by a demurrer to the petition, and also at the trial, and is the first matter presented by the assignments of error. The defendant asserts that there was a material variance in three particulars. One is that the orders contained no designation of the place from which the sugar was to be shipped, while the acceptances named New Orleans as the place. This closely approaches a mere quibble. The orders were addressed to the refiner at New Orleans and expressly gave it an option to ship from any of its refineries, one of which was at New Orleans. So, in naming that place as the one from which shipment would be made, the acceptances were in accord with the orders. Another asserted difference is that the orders fixed one price for the sugar, while the acceptances fixed another price. This is equally without substance. In the acceptances the basis on which the price was calculated was described a little differently from what it was in the orders; but there was

no difference in meaning. Besides, the price calculated on the indicated basis was set out in the price column in the orders and in the acceptances, and was the same in both. Lastly it is said that the orders gave the refiner a conditional right to supply such grades of sugar as it might have available at the time of shipment, while the acceptances omitted the words of condition and made the right absolute. This point, although having more color than the other two, must fail for reasons which will be stated.

The orders and acceptances were both prepared by the refiner—a circumstance strongly suggesting they were intended to be in accord. After the acceptances were given, both parties in several ways affirmatively treated the orders as effectively accepted. Not until this action was brought was a variance suggested. In such circumstances a court should be solicitous to find, as the parties evidently did before they became hostile, an accord between the two instruments.

The orders were given in July, 1920, and called for shipment of the sugar during September of that year. They set forth carefully the assortment of packages and grades of sugar desired, with the particular price of each, and then said:

"Barrels or equivalent at price of 22½ cents, assortment to be furnished seller by buyer before September 1, 1920, but subject to such substitutions as seller may find necessary to make. In event assortment is not furnished prompt seller reserves right to ship such grades as it has available at the time of shipment."

The acceptances set forth the assortment of packages and grades, with prices, in the same way, and then said:

"Seller reserves right to ship such grades as it has available at the time of shipment."

This provision in the acceptances is well constructed and can have but one meaning. But not so of the provision quoted from the orders. In any view it is neither gram-

matical nor rightly punctuated. It was typewritten, and probably was prepared with the idea that the assortment of packages and grades would not be embodied in the orders, but would be furnished by the buyer later on. In fact, as just shown, the assortment was set forth in the orders. But, putting this aside, the context and the sense of the whole provision indicate that the clause, " in event assortment is not furnished prompt," was intended to be a part of and to qualify what precedes it rather than what follows. If that was the meaning intended, a mistake in punctuation by the typist should not be permitted to defeat it. *Ewing* v. *Burnet,* 11 Pet. 41, 54; *Hammock* v. *Farmers' Loan and Trust Company,* 105 U. S. 77, 84. The parties evidently treated it as the true meaning when the orders and acceptances were given, for their acts already recited have no other explanation. There is ample warrant therefore for regarding the full provision as reading:

" Barrels or equivalent at price of 22½ cents. Assortment to be furnished seller by buyer before September 1, 1920, but subject to such substitutions as seller may find necessary to make in event assortment is not furnished promptly. Seller reserves right to ship such grades as it has available at the time of shipment."

In this view the orders and acceptances contained the same reservation of a right to ship available grades. A like conclusion in a like situation was reached by the Circuit Court of Appeals for the Fifth Circuit in *American Sugar Refining Co.* v. *Newnan Grocery Co.,* 284 Fed. 835.

To avoid any misapprehension, it is well to state at this point that, in fact, the refiner delivered the assortment of packages and grades specified in the orders and repeated in the acceptances.

In its answer the defendant set up two defenses expressly based on the Lever Act of August 10, 1917, c. 53, 40 Stat. 276, as amended by the Act of October 22, 1919, c. 80, 41 Stat. 297, and on orders and regulations made there-

under. One defense was to the effect that the plaintiff was not entitled to " more than one cent per pound profit on what the sugar cost, which was the *prima facie* reasonable profit fixed by the President," and in no event was entitled to " more than a reasonable profit." The other defense was to the effect that the contracts were unlawful, because they provided for delivery at a future time, more than thirty days away, and thereby " tended to increase the price of sugar and to promote the hoarding thereof." Each of these defenses was challenged by a demurrer on the grounds, first, that the facts alleged were not sufficient to constitute a defense under the Lever Act, and, secondly, that that Act was in conflict with the Fifth Amendment to the Constitution and void. The demurrers were sustained on the second ground; and the defendant assigns error on that ruling.

As the Lever Act is a long one with various provisions, we assume that the District Court's ruling was confined to certain provisions in sections 4, 5, and 6, for they are all that could have any bearing. Section 25, mentioned in the briefs, related only to coal and coke. Section 1, likewise mentioned, provided for the issue of regulations and orders to carry out other sections, but did not alter or enlarge their prohibitions or requirements.

Section 4 provided it should be " unlawful for any person wilfully . . . to make any unjust or unreasonable . . . charge in . . . dealing in or with any necessaries," or to agree with another " to exact excessive prices for any necessaries." In a series of cases, of which *United States* v. *Cohen Grocery Company,* 255 U. S. 81, and *Weeds Inc.* v. *United States,* 255 U. S. 109, are examples, this Court held that provision invalid as contravening the due process of law clause of the Fifth Amendment, among others, because it required that the transactions named should conform to a rule or standard which was so vague and indefinite that no one could know what

it was. By copious references to judicial pronouncements and proceedings the court illustrated that the terms " unjust," " unreasonable " and " excessive " as applied to prices by that provision had no commonly recognized or accepted meaning. The ground of the decision is reflected by the following excerpt from the opinion in the first case (255 U. S. 89):

" Observe that the section forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes [by court and jury after the act] to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against. In fact, we see no reason to doubt the soundness of the observation of the court below, in its opinion, to the effect that, to attempt to enforce the section would be the exact equivalent of an effort to carry out a statute which in terms merely penalized and punished all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury."

The defendant attempts to distinguish those cases because they were criminal prosecutions. But that is not an adequate distinction. The ground or principle of the decisions was not such as to be applicable only to criminal prosecutions. It was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all. Any other means of exaction, such as declaring the transaction unlawful or stripping a participant of his rights under it, was equally within the principle of those cases. They have been so construed and applied by other courts in civil proceedings. *Standard Chemicals, etc., Corporation* v. *Waugh Chemical Corporation*, 231 N. Y. 51, 54; *Dunman* v. *South Texas Lumber Co.*, 252 S. W. 274, 275. In the first of these citations, the

Court of Appeals of New York, referring to this Court's ruling in the *Cohen Grocery Company Case,* well said: "The ground on which it placed its judgment applies, and with like consequences, to civil suits as well. The prohibition was declared a nullity because too vague to be intelligible. No standard of duty had been established. . . . The variant views of judges of the District Courts were quoted as evidence of the absence of a standard. If this is the rationale of the decision, its consequences are not limited to criminal prosecutions. A prohibition so indefinite as to be unintelligible is not a prohibition by which conduct can be governed. It is not a rule at all; it is merely exhortation and entreaty."

In *Levy Leasing Company* v. *Siegel,* 258 U. S. 242, 250, a civil case arising out of the war-time rent law of the State of New York, this Court referred to the *Cohen Grocery Company Case* as "dealing with definitions of crime" and declared it "not applicable." This brief reference is now pressed on our attention, special emphasis being laid on the words "dealing with definitions of crime." We appreciate their import, but must recognize that they do not adequately reflect the matter dealt with. As already shown, it was broader than they indicate; and of course they were not intended to qualify or limit the decision. The important part of the reference was the declaration that the decision was not applicable to the case then under consideration. The inapplicability resulted from a material difference between the cases. One dealt with a federal statute prohibiting the sale of sugar at unjust, unreasonable and excessive prices, and the other with a state statute directed against reserving unjust, unreasonable and oppressive rent in the leasing of real property in a city for dwelling purposes.

The federal statute contained no provision pointing to what should be deemed a just, reasonable and not excessive price; and there was no accepted and fairly stable

commercial standard which could be regarded as impliedly
taken up and adopted by the statute, as this Court con-
strued it. While sugar has a market value, that value is
subject to fluctuations which individual manufacturers
and dealers can neither control nor readily foresee. The
price in one trade center is affected by that in others, and
in all there are material variations, even in short periods.
The tendency to vary is illustrated in the present record,
which shows that the price advanced in the early part of
1920, reaching 26 cents a pound in June, then remained
steady for a month or two, and then declined irregularly
to about eight cents.

The New York statute was not silent as to what should
be deemed a just, reasonable and unoppressive reserva-
tion of rent. It recognized and named elements which
would require consideration, and the state court construed
it as prescribing a standard " which permitted the land-
lord to receive a reasonable income on his investment,"
valued as of the time when the rent was reserved. *Levy
Leasing Company* v. *Siegel,* 194 App. Div. 482, 506; s. c.
·230 N. Y. 634. So, when the case came here the question
presented in this connection was whether that standard
was sufficiently definite to satisfy the requirement of due
process of law in the Fourteenth Amendment. This Court
held that it was. Real property, particularly in a city,
comes to have a recognized value, which is relatively
stable and easily ascertained. It also comes to have a
recognized rental value—the measure of compensation
commonly asked and paid for its occupancy and use—the
amount being fixed with due regard to what is just and
reasonable between landlord and tenant in view of the
value of the property and the outlay which the owner
must make for taxes and other current charges. These
are matters which in the course of business come to be
fairly well settled and understood. A standard thus de-
veloped and accepted in actual practice, when made the

test of compliance with legislative commands or prohibitions, usually meets the requirement of due process of law in point of being sufficiently definite and intelligible.

The difference which we have pointed out between the two statutes and between the matters sought to be regulated by them made it obvious that the decision on the validity of one statute had no bearing on the question of the validity of the other.

As section 4 was invalid, whether taken as a civil regulation or as a criminal statute, it follows that in so far as the special defenses were based on it the demurrers were rightly sustained.

Section 5 was not dependent on section 4; nor did this Court consider its validity along with that of section 4. For present purposes, it may be described as (a) providing for the licensing of transactions in necessaries, including the manufacture, refining, distribution and sale of sugar; (b) as declaring that the President, on finding that any licensee was taking an unreasonable profit, might, by an order reciting his finding, require such licensee to discontinue taking the unreasonable profit, and might also determine what was a reasonable profit to be taken in lieu of the one found unreasonable; and (c) as providing that " in any proceedings brought in any court such order of the President shall be prima facie evidence."

It is apparent that the section did not invest the President with general authority to fix the profit which might be taken on sales of sugar, but only with special authority, on finding that a licensee was taking an unreasonable profit, to require that such practice on the part of the licensee be discontinued and to determine what was a reasonable profit to be taken in place of the one condemned.

The special defenses, while showing that the plaintiff was licensed to manufacture, refine and sell sugar, contained no allegation that the President had found that the

plaintiff in selling its sugar was taking an unreasonable profit, nor any allegation of an order by the President requiring it to discontinue such a practice. Of course, the special defenses could not derive any support from that section when there had been no action by the President under it.

One of the special defenses speaks of the President's having fixed one cent per pound as the profit which might be taken. But the reference is to an administrative regulation[1] which had no application to sales by a manufacturer or refiner to a wholesale dealer, such as are in question here. Besides, that regulation was revoked May 31, 1919, before these contracts were made. There was an administrative regulation[2] applicable to manufacturers and refiners which restricted them to taking not more than a fair and reasonable advance over cost; but this regulation was revoked January 26, 1919, before the contracts were made.

The allegation that the contracts called for a delivery more than thirty days in the future, and therefore were unlawful as tending to increase the price and promote hoarding, was of no legal effect. While section 6 prohibited wilful hoarding, and also certain acts done for the purpose of unreasonably increasing or diminishing the price, it did not prohibit a selling for delivery more than thirty days in the future. Nor did the special defenses set forth any facts which could be regarded as bringing the contracts within any prohibition of that section. Not improbably the pleader had in mind an administrative regulation[3] applicable to manufacturers and refiners which forbade making contracts of sale under which

---

[1] Food Administration Special License Regulations, No. XI, A–5.

[2] U. S. Food Administration Special License Regulations, No. VI, B–2 and C–2.

[3] U. S. Food Administration Special License Regulations, No. VI, A–2.

shipment was not to be made within thirty days. But no support can be derived from that regulation, for it was revoked January 26, 1919, prior to the making of these contracts.

In so far therefore as the special defenses were based on sections 5 and 6 and the regulations cited the demurrers were rightly sustained—and this regardless of any question respecting the validity of either of those sections or of any of the regulations.

A short statement of the case shown by the evidence, in so far as it is embodied in the record, will give a better understanding of the remaining questions.

By the contracts, made in July, 1920, the plaintiff agreed to deliver the sugar to a carrier at New Orleans during September, or soon thereafter, for shipment to the defendant at Macon, Georgia; and the defendant agreed to accept delivery to the carrier, to pay the contract price, and to bear the carrier's charges. In August the market price of sugar took a downward turn and continued to decline to the end of that year. In September the plaintiff made the delivery to the carrier as agreed; and in due course the sugar reached Macon. The defendant then refused to accept it and wrote to the plaintiff saying, "For the good of whom it may concern we suggest that this carload of sugar be stored to save any additional cost (demurrage, etc.) against whoever might be affected." The storage was effected as suggested with a Macon warehouseman, but was intended to be only temporary. Much correspondence ensued—the defendant repeating its refusal to take the sugar, and the plaintiff insisting the defendant was bound to take it and to bear the carrier's charges, etc. Finally, on November 30, the plaintiff sent to the defendant a notice saying, "As you have continued to refuse to take this shipment we must now inform you that unless you accept and pay for same at once we will resell this sugar for your account. When resale is made

we will require you to remit the difference between contract price and price received on resale, as well as for all freight, storage and other charges incurred." The defendant made no answer. The plaintiff then paid the several charges, took possession of the sugar and resold it in and around Macon—the last portion being sold December 20. There was an oversupply of sugar in the hands of wholesale dealers and others in that vicinity at the time, which made it difficult to effect a resale. But the plaintiff made an active and honest effort to make a fair sale and succeeded in obtaining the full market price prevailing in larger markets, plus the freight to Macon. The total amount realized, less storage and other charges not questioned, was $2,963.04. With this sum credited on the contract price there remained a balance of $5,111.70, which was demanded in the first count of the plaintiff's petition.

On the trial the defendant sought to prove by jobbers and dealers in Macon that the price of sugar at Macon was higher in October and November than in December, and that in December particular sales were made at a higher rate than the plaintiff obtained on the resale—the purpose in offering this testimony being to discredit the fairness of the resale by the plaintiff. A preliminary examination of the witnesses disclosed that the market at Macon was greatly demoralized during that period; that jobbers and dealers were selling for what they could get regardless of cost, lest they might lose more through a further decline; that the buying was in relatively small quantities and was on what was termed a "hand to mouth" plane; and that the particular sales in December were of such a character that they would shed no light on the fairness of the resale. On the plaintiff's objection, the court refused to permit the proffered testimony to go to the jury. Complaint is made of this ruling. In our opinion it constitutes no ground for a reversal. There were

obvious infirmities in what was proposed to be shown about the market price in October and November; but we need not dwell on them, because, as will be explained later on, the state of the market in those months came to be quite immaterial. What was proposed to be shown about particular sales in December was rightly excluded. The sales were of a kind that did not tend to establish a standard by which to judge the plaintiff's resale. Besides, the real question was not whether the plaintiff got the best possible price, or as much as others got in special instances, but whether the resale was fairly made in a reasonably diligent effort to obtain a good price. To have admitted the proffered testimony would have tended to confuse and mislead the jury.

At the trial the plaintiff took the position that when it delivered the sugar to the carrier at New Orleans its obligation under the contracts was fully performed and it became entitled to the contract price; that it could then have abandoned the sugar, but was not obliged to do so; that it had a vendor's lien thereon which could be availed of at any time before the sugar passed into the actual possession of the defendant; that it could realize on the lien by retaking the sugar and, after notice to the defendant, reselling the same for the latter's account and crediting the net proceeds on the contract price; and that it could recover the balance from the defendant. The District Court, in dealing with the first count of the petition, charged the jury to that effect—evidently believing it was conforming to Georgia statutes and decisions on the subject. No objection was made to that part of the charge nor was any exception taken to it; so we assume that it conformed to the local law and was applicable to the evidence. The court then proceeded to explain how that part of the charge should be applied, and in that connection said to the jury that if they believed from the evidence that the plaintiff retook possession under its vendor's lien,

they should next consider whether the resale was made within a reasonable time, and in doing so should take as the starting point November 30, when the plaintiff gave notice of its purpose to retake and resell, and should consider only the period between that date and December 20, when the resale was concluded. The defendant's counsel excepted to this, the terms of the exception being, " We except to the court fixing November 30 as the time from which a reasonable time should be figured. I construe the plaintiff as being always in possession." The defendant now insists the exception was well grounded. But we are of a different opinion. As the jury's verdict was for the plaintiff on the first count, they must have found that the plaintiff retook possession and made the resale under a vendor's lien. If it had such a lien under the law of Georgia—as we must assume in view of the unchallenged charge on that subject—the court plainly was right in saying the date when possession was taken under the lien was the starting point from which to reckon a reasonable time; and was also right in designating November 30 as that date. The suggestion in the exception that the plaintiff was " always in possession " had no support in the evidence set forth in the record, for it shows that the plaintiff surrendered possession to the carrier at New Orleans and was not again in possession until after the notice of November 30 was given declaring the plaintiff's purpose to take possession and sell. According to the Georgia statute, which the District Court applied, the plaintiff was entitled to take possession under its lien at any time before " actual receipt " of the sugar by the defendant. Parks Ann. Code, sec. 4132; *Branan* v. *Atlanta and West Point R. R. Co.,* 108 Ga. 70, 73. A duty to sell under the lien could not arise until possession was taken under it; and the reasonable time permitted for making a sale by way of realizing on the lien hardly would begin to run before.

What we have just said explains why the testimony offered respecting the state of the market at Macon in October and November, before the plaintiff took possession under the lien, became immaterial.

*Judgment affirmed.*