**Dorothy Lorraine STAMUS and Lynne Marie Stamus, Plaintiffs,**

v.

**Frank W. LEONHARDT et al., Defendants,**

**United States of America, Plaintiff-Intervenor,**

**State of Iowa, Defendant-Intervenor.**

**Civ. No. 73-126-2.**

United States District Court, S. D. Iowa, C. D.

May 28, 1976.

Gordon E. Allen, Leslie Babich and David R. Rasey, Des Moines, Iowa, for plaintiffs.

Ray A. Fenton, County Atty., Charles S. Crook, III, Asst. County Atty., Des Moines, Iowa, for defendants.

Allen L. Donielson, U. S. Atty., Paul A. Zoss, Asst. U. S. Atty., Des Moines, Iowa, for plaintiff-intervenor USA.

Richard C. Turner, Atty. Gen., Stephen C. Robinson and Theodore R. Boecker, Asst. Attys. Gen., Des Moines, Iowa, for defendant-intervenor.

## ORDER FOR DECLARATORY JUDGMENT

HANSON, Chief Judge.

In June of 1972, plaintiffs Dorothy Lorraine Stamus and Lynne Marie Stamus were taken into custody due to alleged mental illness and detained involuntarily at Broadlawns Polk County Hospital pursuant to the then-existing Iowa civil commitment laws.[1] Approximately one year later, the Stamuses filed this action attacking the constitutionality of the Iowa involuntary hospitalization statutes for the mentally ill, as well as the constitutionality of the practices to which they were subjected by de-

fendant Polk County officials. In light of plaintiffs' prayer for permanent injunctive relief regarding an Iowa statute, a three-judge court was convened in this case under 28 U.S.C. §§ 2281 and 2284 (1970). A new civil commitment law for the involuntary treatment of the mentally ill in Iowa became effective January 1, 1976, however, and the prayer for permanent injunctive relief has become moot. This cause has since been remanded to one judge for a declaratory judgment as to the constitutionality of Chapters 228 and 229 of the Iowa Code, 1975, hereinafter referred to as the Code. Plaintiffs' complaint is based on 42 U.S.C. § 1983; this Court has subject matter jurisdiction under 28 U.S.C. § 1343(3).

In, addition to challenging the constitutionality of the former Iowa civil commitment laws, the Stamuses seek monetary damages as a result of their detention in Broadlawns Polk County Hospital in June of 1972. This action was originally brought against Richard Preston, Roscoe Riemenschneider, Lois Moody, Frank W. Leonhardt, Charles Ingersoll, the Broadlawns Polk County Hospital, and the Hospitalization Commission for Polk County, Iowa, hereinafter referred to as the Polk County defendants.

Defendants Richard Preston and Roscoe Riemenschneider are currently members of the Hospitalization Commission for Polk County, Iowa, and were members at the time of the events alleged in plaintiffs' amended complaint. Defendant Lois Moody, a deputy clerk of the Polk County District Court, was designated by defendant Frank W. Leonhardt, Clerk of the Polk County District Court, to act in his place as a member of the hospitalization Commission at the time in question. Defendant Charles Ingersoll has at all pertinent times been the administrator of Broadlawns Polk County Hospital, the Hospital which initially receives most persons involuntarily hospitalized as mentally ill in Polk County. By an

---

1. The Iowa statutes which are challenged in this action, Chapters 228 and 229 of the Iowa Code, 1975, were repealed effective January 1, 1976, by Acts 1975 (66 G.A.) Ch. 139, §§ 31 and

2. The new Chapter 229, Hospitalization of Mentally Ill Persons, is not challenged in this action.

order of December 16, 1974, defendants Broadlawns Polk County Hospital and the Polk County Hospitalization Commission were dismissed as not being "persons" capable of being sued under 42 U.S.C. § 1983. By an order of February 28, 1975, current members of the Hospitalization Commission, Charles Hintz, M.D., Dring D. Needham, and deputy clerk Donna Fitzgerald were added as defendants.[2]

Due to the importance of the legal issues involved, the Court granted the United States of America leave to intervene as plaintiff in order to represent the public interest in obtaining a ruling on the constitutionality of the hospitalization procedures of Chapters 228 and 229. Shortly thereafter, the State of Iowa moved to intervene as a defendant and the Court granted this motion on March 31, 1975.

Since not all the parties are interested in the issues of individual liability to the Stamuses and possible monetary damages, the parties requested at a pretrial hearing on February 12, 1975, that the Court rule initially on the constitutional issues presented in the case, with the issues of individual liability and damages to be resolved later at a jury trial. The Court acquiesced, and pursuant to this understanding the parties have conducted extensive discovery by way of requests for admissions, interrogatories and depositions.

The matter now before the Court is plaintiffs' motion for partial summary judgment under Rule 56, F.R.Civ.P., or for judgment on the pleadings under Rule 12(c), and on defendants' motion to dismiss. While some factual disputes still exist as to the particular circumstances surrounding the involun-

tary confinement of the Stamuses, these facts bear mostly on the issues of individual liability and monetary damages. To the extent they intrude upon the constitutional law, the Court's ruling will be restricted. Those factual disputes that do exist are not sufficient to prevent the Court from now ruling on the constitutionality of Chapters 228 and 229 of the Code.

## FACTUAL BACKGROUND [3]

The Iowa statutory scheme under attack permitted the various county hospitalization commissions to involuntarily hospitalize persons within that county who were alleged to be mentally ill. Chapter 228 of the Code established a hospitalization commission in each of the State's counties; Chapter 229 set forth the procedures for the commitment and discharge of mentally ill persons.

Each Iowa county was to establish a three-member commission of hospitalization which had local jurisdiction over most applications for admissions and commitments to the state hospitals for the mentally ill. Iowa Code § 228.1, § 228.8. The major exception to the commissions' jurisdiction was for persons held under criminal charges. Iowa Code § 228.8. The members of the commission were to include the clerk of the district court, a "reputable" practicing physician and a "reputable" practicing lawyer, with the latter two being appointed by the district court for a term of two years. Iowa Code § 228.2, § 228.3.

Involuntary hospitalization of an individual was instituted by the filing of a sworn information which had to allege that the person (hereinafter referred to as the subject) was "believed to be mentally ill, and a

2. The parties filed a stipulation on April 11, 1975, that defendants Hintz, Needham and Fitzgerald are not responsible or liable for monetary damages to the plaintiffs. Moreover, while a factual dispute does exist as to whether Mr. Needham is actually a commission member, that issue is irrelevant to the constitutional issue raised.

3. The discussion of the factual background in this case is in three parts: (1) a description of the general provisions of Chapters 228 and 229 of the Code; (2) the usual practices and proce-

dures of the Polk County defendants; and (3) the undisputed facts surrounding the involuntary confinement of the Stamuses. The primary source of the facts has been Defendants' Responses to Plaintiff-Intervenor's Request for Admissions, filed on August 8, 1975, and September 23, 1975. Depositions and interrogatories have not been relied upon to any significant extent. The uncontroverted facts will be the basis of this Court's ruling; the Court will not rule in areas where the facts are disputed.

fit subject for custody and treatment" in a state hospital. Iowa Code § 229.1. "Mental illness" was defined as "every type of mental disease or mental disorder." Iowa Code § 229.40. The information also had to include where the subject could be located within the county and his or her address, if known. Any person could file a sworn information.

Upon the filing of a proper information, the hospitalization commission then had to determine whether there was reasonable cause to believe the allegations of mental illness contained therein, and, if satisfied, the commission could order the subject brought before it for a hearing. Iowa Code § 229.2. To this end, the commission could provide for and order custody of the subject until its investigation was concluded. Iowa Code § 229.2. The presence of the subject at the hearing was required, unless it was determined that "such course would probably be injurious to such person or attended with no advantage." Iowa Code § 229.4. The subject was also to be informed of the right to counsel, and, if indigent, that the court would appoint counsel. Iowa Code § 229.5.

Prior to the hearing, the commission would appoint a physician to examine the subject and certify to whether the person in question was in good mental health or mentally ill. Iowa Code § 229.6; see Iowa Code § 229.7. The physician could be a member of the commission or outside the commission's membership. The examining physician's report could be considered at the hearing and the commission could also consider other evidence regarding the person's mental health. The commission was empowered to issue subpoenas and administer oaths. Iowa Code § 229.3.

The commission then determined whether it would be "in the best interests of the person to be examined at a state mental health institute." Iowa Code § 229.9. If such a finding was made, the commission ordered the person "admitted" to the screening center at the hospital in the district nearest to the county. A person was thereafter "committed" to a hospital only upon recommendation of the superintendent of the hospital at which the screening center was located. If a recommendation of commitment was made, the commission could order the person's commitment upon hearing pursuant to §§ 229.2, 229.3, 229.4 and 229.5. Iowa Code § 229.9.

A person had the right to appeal from the commission's finding or could file a habeas corpus action. Iowa Code § 229.17, § 229.37. A person could also request a commission of inquiry, alleging that he or she was not mentally ill and was being unjustly deprived of his or her liberty. §§ 229.31–229.35, Iowa Code.

As far as the record reflects, the statutory scheme as set out under Chapters 228 and 229 of the Iowa Code was not significantly enlarged upon or modified by the procedures of the Polk County Hospitalization Commission. The Code is imprecise in relation to certain key matters, however, and local implementation is necessary. The commitment process was initiated by the filing of a sworn information in the office of the Polk County deputy clerk assigned to the commission. The commission had no written guidelines to be followed in screening the applications, other than the requirement of § 229.1. Once an information was filed, the commission's usual practice was to have the information signed by the deputy clerk and a second commission member. Prior to any hearing, the commission usually had the subject taken into custody and evaluated as to his or her mental status while confined at Broadlawns. The commission did not provide for such an evaluation to be permitted on an outpatient basis, nor did it hold any preliminary hearing on the need for hospital confinement pending the full hearing required by § 229.2. While the Iowa Code did not set a time limit on the period which a person could be detained pending a hearing, a maximum limit of fourteen days was prescribed in Polk County.[4] Under the usual practice, the hearing

---

4. This limit was not imposed until March 16, 1974, almost two years after the plaintiffs' confinement.

envisioned in Chapter 229 was not held until the hospital had completed its evaluation, and then only after the hospital psychiatric staff held a meeting to evaluate the individual. The Code did not require, and the commission did not provide, written notice to the subject of the date, time and place of the hearing or of the factual basis, purpose and possible consequences of the proceeding.

Those typically present at the hearing included one of the commission's attorney members, one of the physician members, the deputy clerk and the individual's attorney. The individual's attorney was usually appointed to represent the subject the day before the hearing or in exceptional cases, the day of the hearing. (Until sometime in August, 1975, one attorney usually handled all the cases heard on the same hearing date.) Before the subject was brought into the hearing room, the panel normally reviewed the case file and hospital record. The subject was then brought into the hearing room and advised of the presence of his or her counsel and the right to appeal. The physician member normally presided at the hearing and initiated the questioning of the individual, which some members of the commission viewed as a "clinical review." The subject's attorney could question the subject and the patient could make a statement on his or her own behalf. The patient was then removed from the room, and if there were other witnesses, their testimony was taken outside the patient's presence. At the close of the hearing, the commission decided either to release the individual, or to admit or commit the person to a state mental hospital. The standard of proof employed was that the members be convinced in their own minds that an individual was in need of further care and treatment. Normally a two-thirds vote by the commission was sufficient to sustain an order of admission or commitment. The commission did not necessarily require that the subject be dangerous to self or others in ordering commitment.

The subject could be held in a state institution pursuant to an order of "admission"

for sixty days, a time limit imposed by the Iowa Department of Social Services. It was the usual practice of the commission not to hold another full hearing to consider whether to "commit" a subject who was already "admitted" to a state hospital. The defendants concede that the recommendation of the superintendent of a mental health institute that a previously "admitted" subject be "committed" was usually dispositive. The lawyer representing the subject to be "committed" was usually not present when the commitment was considered by the commission, and no transcript or verbatim record was made of the hearing.

Once a subject was admitted or committed, the commission usually did not conduct any regular review of the subject's status.

While certain facts surrounding the involuntary hospitalization of the Stamuses remain in dispute, it appears that the procedures generally followed by the commission and set out in Chapter 229 of the Iowa Code were also employed in their instances. Dorothy and her daughter, Lynne Marie Stamus, were involuntarily hospitalized at Broadlawns Polk County Hospital on June 6, 1972, pursuant to orders of the commission. The informations on the plaintiffs were filed after the receipt by deputy clerk Moody of an out-of-state telegram from Beverly Simonsen, Dorothy's daughter and a sister of Lynne Marie. The telegram stated, "I, Beverly Simonsen, being fully aware of my mother D. Lorraine Stamus and my sister Lynne Marie Samus [sic] illness wish to have a filing done for commitment delivery by 8 AM." The informations filled out by deputy clerk Moody did not bear the sworn signature of the informant, as required by § 229.1.

Pursuant to orders issued by the commission, members of the Polk County sheriff's department apprehended plaintiffs on June 6, 1972 and took them, against their will, to Broadlawns Polk County Hospital. Dorothy Stamus remained confined at Broadlawns from June 6, 1972, to June 16, 1972, when she was accorded a hearing before the hospitalization commission. The hearing

resulted in a determination that she be admitted to the Mental Health Institute at Clarinda, Iowa. Dorothy Stamus remained at Clarinda until mid-July, 1972; she was discharged with "limited leave" on July 26, 1972.

Lynne Marie Stamus was hospitalized at Broadlawns from June 6, 1972 to August 9, 1972, and was never accorded a hearing before the hospitalization commission. In the words of the State of Iowa, no hearing was accorded Lynne Marie because the information concerning her "had been lifted." See State of Iowa's Response to Request for Admission No. 27, filed August 8, 1975. Further, there is a factual dispute between the parties as to whether Lynne Marie's status became voluntary soon after her initial placement in Broadlawns. This dispute is not fatal to the Court's ability to rule on the constitutionality of Chapters 228 and 229, however, since the facts regarding the commission hearing and admission of Dorothy Stamus to the Clarinda institute are not controverted.

## LEGAL ISSUES

The plaintiffs' pending motions seek a declaratory judgment to the effect that certain aspects of Chapters 228 and 229 of the Code are unconstitutional, both on their face and as implemented by the defendants and applied to them. Their contentions, which are based upon the due process clause of the Fourteenth Amendment to the United States Constitution, primarily involve alleged procedural defects in the entire commitment process. In addition, plaintiffs challenge the standard for commitment on grounds of substantive due process and vagueness.

The applicability of the Fourteenth Amendment to the civil commitment context can hardly be questioned. As Chief Justice Burger has recently noted, "There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law." *O'Connor v. Donaldson,* 422 U.S. 563, 580, 95 S.Ct. 2486, 2496, 45 L.Ed.2d 396, 410 (1975) (concurring opinion). *See also Specht v. Patterson,* 386 U.S. 605, 608, 87 S.Ct. 1209, 1211, 18 L.Ed.2d 326, 329 (1967); *Doremus v. Farrell,* 407 F.Supp. 509, 513 (D.Neb.1975) (three-judge court); *Lynch v. Baxley,* 386 F.Supp. 378, 385 (M.D. Ala.1974) (three-judge court); *Bell v. Wayne County General Hospital at Eloise,* 384 F.Supp. 1085, 1092 (E.D.Mich.1974) (three-judge court).

## I. PROCEDURAL DUE PROCESS

### A. NOTICE AND OPPORTUNITY TO BE HEARD

Plaintiffs' challenges to the adequacy of the notice and hearing provisions of Chapter 229 involve two distinct occurrences: the State's initial contact with the subject (and its possible consequences) and the "full hearing" before the commission itself. The initial treatment accorded the Stamuses apparently is the norm in Polk County: the commission, proceeding *ex parte,* authorized local sheriffs to apprehend the Stamuses and take them directly to Broadlawns Hospital. No notice preceded plaintiffs' apprehension and placement at Broadlawns; nor was a preliminary hearing held as to the cause therefor, either before or shortly after this occurrence. The more plenary hearing before the commission was held for Dorothy Stamus on June 16, 1972; no such hearing was held for Lynne Marie Stamus. While Dorothy Stamus appeared at her hearing and was represented by counsel, no prior notice of that proceeding was provided her by the commission. Defendants' admissions reveal that the procedures just described are the commission's normal operating procedures; Chapter 229 does not appear to mandate any more stringent safeguards for detainees.

### 1. PLAINTIFFS' INITIAL DETENTION

Chapter 229 of the Code imposed no time limitations on the initial detention of a subject who was taken into custody pending a full commission hearing. Moreover, Section 229.2 of the Code *authorizes* the com-

mission to hold a subject in custody pending completion of the evaluation necessary for the full hearing. Thus, the need for adequate procedural safeguards at this initial stage of the commitment process is compelling, for a lengthy deprivation of liberty can be involved.

As a matter of constitutional law, it is not clear whether the Stamuses had an absolute right to some form of notice and hearing *prior to* their apprehension. Certain circumstances could well make such a rigid approach impractical. A violation of their constitutional rights did occur, however, in that no determination as to probable cause for their initial detention was ever made. Such a hearing, when not feasible prior to custody, should be held shortly thereafter.

Because the facts are disputed regarding the condition and behavior of the Stamuses at the time of their apprehension, the Court cannot precisely describe the procedural safeguards they should have been afforded. The reported decisions in this particular area of commitment law reveal that a probable cause hearing is mandated by due process, but that a flexible approach is to be followed. In *Bell v. Wayne County General Hospital, supra,* the three-judge panel held "that a person believed to be mentally ill may not be involuntarily detained without prompt preliminary hearing. We do not specify the precise length of time a person may be confined before an initial hearing must be held; however . . . 5 days . . . appears to be appropriate." 384 F.Supp. at 1098. The Court in *Doremus v. Farrell, supra,* similarly endorsed a procedure whereby initial hearings "should take place within five days of confinement." 407 F.Supp. at 515. The Court in *Lynch v. Baxley, supra,* ruled that "Emergency detention without a hearing on its appropriateness and necessity can be justified only for the length of time required to arrange a probable cause hearing before the probate judge or other judicial officer empowered by law to commit persons . . .." 386 F.Supp. 388. *See also Developments in the Law—Civil Commitment of the Mentally*

*Ill,* 87 Harvard Law Review 1190, 1275–1279 (1974). The probable cause hearing need not be as extensive as the full commission hearing which may follow; the issue to be decided is not whether the person should be committed, but whether probable cause exists to justify involuntary detention of the subject pending the plenary commission detention. At the least, due process requires adequate prior notice to the subject of the probable cause hearing, and the presence of the subject, with counsel. *See Bell v. Wayne County General Hospital, supra,* at 1098; *Lynch v. Baxley, supra,* at 388.

While the presence of disputed factual issues in the instant case precludes a specific delineation of the parameters of the probable cause hearing to which the Stamuses were entitled, there is no dispute that their initial detention at Broadlawns was neither preceded or followed by a probable cause hearing. Plaintiffs were denied due process by the absence of any proceeding to determine the reasonableness of their involuntary detention pending a full commission hearing.

## 2. THE HEARING BEFORE THE COMMISSION

█ On June 16, 1972, Dorothy Stamus was afforded her plenary commission hearing. "Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded," and it must set forth the basis for detention with particularity. *In re Gault,* 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527, 549 (1967). The Code did not require, nor did Dorothy Stamus receive, written notice of this proceeding.

The *Gault* notice requirements have been applied to civil commitment proceedings and courts have generally required that "such notice should include the date, time, and place of the hearing; a clear statement of the purpose of the proceedings and the possible consequences to the subject thereof; the alleged factual basis for the proposed commitment; and a statement of the legal standard upon which commitment is

authorized." *Lynch v. Baxley, supra,* at 388; *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972), vacated and remanded, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *Bell v. Wayne County General Hospital, supra.* Chapter 229 is clearly deficient in this regard. Further, by failing to provide any notice, defendants denied Dorothy Stamus an opportunity to prepare a defense in order that there could be a fair hearing with a full presentation of both sides of the case. Absent any notice to Mrs. Stamus, the requirements of due process were violated. Alleged defects in the commission hearing itself will be considered in the discussion which follows.

## B. RIGHT TO A FAIR PLENARY HEARING

Plaintiffs assert that due process in the commitment context requires that the subject be presented at all proceedings held to determine the disposition of the subject's case, and be allowed to participate therein, present a defense, have effective assistance of counsel, and have the right against self-incrimination.

■ Section 229.4 of the Code accorded the subject the right to be present at hearings unless the hospitalization commission found that the subject's presence would "probably be injurious" to the subject "or attended with no advantage." Pursuant to this provision, Dorothy Stamus was taken before the hospitalization commission during her hearing and questioned. However, as was the general practice in Polk County, she was excluded from the hearing room preceding and after her questioning period. This restriction on the plaintiff's right to be present was an unconstitutional deprivation of her right to due process.

The Supreme Court has required the presence of the person proposed to be involuntarily committed under a Sex Offender Act at all proceedings conducted for that purpose unless the right was knowingly and intelligently waived by the subject of the proceeding or his or her attorney. *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). Although this right is

explicitly preserved for criminal defendants in the Sixth Amendment to the Constitution, courts have required the same right in the civil commitment context. *Lynch v. Baxley, supra; Bell v. Wayne County General Hospital, supra; State ex rel. Hawks v. Lazaro,* 202 S.E.2d 109 (W.Va.1974). The same purposes for requiring the person's presence exist in both the civil and criminal context: to allow the individual to assure that his or her interests are being protected and to give the fact-finder an opportunity to speak with the person and observe his or her demeanor. The results of the hearings, confinement in an institution and a loss of personal liberty, are often the same in the civil commitment and criminal context. Thus, there must be a right for the individual under discussion to be present at all proceedings for civil commitment. The hospitalization commission in Polk County transgressed this right as applied to Dorothy Stamus by not permitting her to be present throughout her hearing, and thereby deprived her of procedural due process. Further, as recognized by the Court in *Lynch v. Baxley,* "The right to be present at the hearing necessarily includes the right to participate therein to the extent of the subject's ability." 386 F.Supp. at 389. To the extent Dorothy Stamus was excluded from the hearing, this right was clearly transgressed.

■ Closely related to the right to participate in the hearing is the ability to offer evidence on one's own behalf and to present a defense. Plaintiffs contend that this right must be afforded to the subject at the hearing. As a part of the ability to present a defense and in order that it be a meaningful right, plaintiffs argue for the right to compel attendance and/or testimony of witnesses, the right to confront and cross-examine witnesses in support of the commitment, and the right to independent expert examination and assistance regarding the subject's mental illness, with the district court to appoint an expert if the subject cannot afford these services.

Section 229.3 of the Code gave the hospitalization commission the power to issue

subpoenas and administer oaths to witnesses. If a witness refused to appear or to testify, the commission could inform the district court, which would proceed as though the refusal had occurred in a legal proceeding before the court. No additional provision in the Code granted the subject of the proceedings a separate right from that of the hospitalization commission to compel the attendance and testimony of witnesses, but the Code did not prohibit the use of the hospitalization commission's power to the benefit of the person proposed to be mentally ill. Plaintiffs have failed to demonstrate that Dorothy Stamus ever requested the hospitalization commission to use its subpoena power on her behalf, and that the commission then refused to do so. There is no indication in the record that the commission could not or did not use its power to compel testimony of witnesses for both parties.

The record is also incomplete regarding the use of independent expert testimony on behalf of the person to be committed. The defendants have admitted that it was rare for an outside expert to testify as to the mental condition of an individual, but that Chapter 229 of the Code did not prohibit it and if the patient and his or her attorney desired to present the testimony of an expert, the hospitalization commission would certainly have allowed said testimony to be heard. The record does not show that Dorothy Stamus requested such right and was refused it, or that she was unable to afford expert testimony and accordingly requested the hospitalization commission to appoint an expert, with the hospitalization commission refusing to do so. The same problem exists for the claimed right to confront and cross-examine witnesses. Plaintiffs did not demonstrate a Code prohibition or a commission denial of the claimed right. In order for the Court to reach the issue, it would have to assume that Dorothy Stamus' counsel, who was present at the entire hearing, was prohibited from cross-examining the witnesses. Such an assumption, however, cannot be made from the present record. Accordingly, the Court will not decide on the basis of the present record that Chapter 229 of the Code or the Polk County procedures challenged in this suit deny due process by refusing the subject the right to confrontation.

█ It is next asserted that Dorothy Stamus was denied the presence of effective counsel at the hearing. Section 229.5 of the Code provides that the commission "shall inform" a non-counseled subject appearing before it of the right to representation, and "shall assign" counsel if no one is employed by the subject. Plaintiffs contend that the subject must be fully advised of his or her right to counsel at all significant stages of the commitment process and that counsel will be appointed if the person is unable to afford counsel. Plaintiffs also assert that counsel must be made available far enough in advance to permit adequate opportunity to prepare for the hearing. The Court agrees.

"The subject of an involuntary civil commitment proceeding has the right to the effective assistance of counsel at all significant stages of the commitment process. Further, he has the right to be advised of his right to counsel, and to the appointment of counsel if indigent." *Lynch v. Baxley,* 386 F.Supp. at 389 (citations omitted). Chapter 229 of the Code contained no provisions whereby involuntary detainees were informed of their right to .counsel upon being taken into custody. Further, while counsel were appointed for subjects for their hearings, such appointments often occurred immediately prior thereto. The timing of the appointment, which is aggravated by the absence of any meaningful notice to the subject (and hence counsel) operates to almost ensure ineffectiveness. Moreover, the Code fails to provide for representation subsequent to the commission hearing.[5]

---

5. Because the record reveals the Stamuses to have been in contact with counsel, both before and during the commitment process, the Court is unable to rule on whether a counsel-related

violation occurred in their instances. Further, as a final matter regarding the right to a fair hearing, plaintiffs assert that the Fifth Amendment privilege against self-incrimination is

## C. STANDARD OF PROOF

■ Plaintiffs also urge that they were denied due process in that the Iowa statute did not require and the commission did not apply a standard of clear and convincing proof before they could be involuntarily admitted or committed to a hospital for treatment of mental illness. In most civil cases in Iowa, "the burden of proof is measured by the test of preponderance of the evidence," Iowa R.Civ.P. 344(f)(6). Plaintiffs contend that this "preponderance" standard is constitutionally infirm in an involuntary commitment proceeding.

The Supreme Court in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), looked to the nature of the right at stake in determining what standard of proof should be employed in a juvenile delinquency proceeding. The Court reasoned that the loss of the child's liberty and the stigmatization with which the juvenile is threatened are comparable to the deprivations threatened in the criminal process, and therefore, proof beyond a reasonable doubt was required. *Id.* at 365–66, 90 S.Ct. at 1073, 25 L.Ed.2d at 375–76.

Similarly, to determine the standard which should have been applied to commitment proceedings under the Code, the Court must consider the nature or the rights involved. Civil commitment results in a loss of the subject's liberty. In addition, the legal and social consequences of commitment constitute a stigma of mental illness which can be as debilitating as that of a criminal conviction. *See In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648, 668–69 (1973); Hearings on S. 935 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 88th Cong., 1st Sess., 38 (1963). Considering the significant interests at stake in the civil commitment proceeding, the Court in *Lynch v. Baxley* stated:

Because the stigmatization and loss of liberty attendant upon forced confine-

ment are of the most profound consequence to the individual affected, due process demands that he be subjected to such disabilities only if the necessity for his commitment is proved by evidence having the highest degree of certitude reasonably attainable in view of the nature of the matter at issue. In a civil commitment proceeding, the questions involved are the primarily subjective ones of the subject's mental condition and the likelihood that he will be dangerous in the future. Such subjective determination cannot ordinarily be made with the same degree of certainty that might be achieved where purely objective facts and occurrences are at issue. Consequently, the trier of fact must be persuaded by clear, unequivocal, and convincing evidence that the subject of the hearing is in need of confinement under the minimum standards for commitment herein enumerated. 386 F.Supp. at 393.

The Court finds the reasoning in *Lynch* persuasive. Because the cost to the individual of her loss of liberty in the commitment proceeding is so great, this Court finds that the "preponderance" standard is inadequate; due process requires proof of a "clear and convincing" nature. *Doremus v. Farrell, supra,* at 517; *see also In re Ballay, supra; Lessard v. Schmidt, supra; Bartley v. Kremens,* 402 F.Supp. 1039 (E.D.Pa. 1975); *State ex rel. Hawks v. Lazaro,* 202 S.E.2d 109 (W.Va.1974).

## II. STANDARD OF COMMITMENT

### A. SUBSTANTIVE DUE PROCESS

■ To initiate the involuntary commit process, the person filing a sworn information must allege that the subject thereof "is believed to be mentally ill, and a fit subject for custody and treatment in the hospital." § 229.1. Upon the filing of such an information, a warrant may issue *ex parte* from the commission, authorizing the subject's "immediate detention at a county custodial

available in all civil commitment proceedings, and that subjects must be advised of their right to assert the privilege at any time. Because the record contains no showing that any state-

ments of Dorothy Stamus were ever used against her—in either the civil commitment process or any later proceedings—the Court will not address this issue.

facility. . . . [w]hile it is clear that the warrant and information imply conduct out of compliance with the governing standard, the sole standard asserted in the statute is a commission finding, also *ex parte,* that the person to be confined is mentally ill and a fit subject for custody and treatment." *Monson v. Hospitalization Commission for Polk County,* 338 F.Supp. 1315, 1317–18 (S.D.Iowa 1972). Section 229.40 of the Code defined mental illness as including "every type of mental disease or mental disorder." After a temporary detention of the subject to allow for a physician's evaluation and report, the commission holds a hearing to find whether "it would be in the best interests of the person to be examined at a state mental health institute." § 229.9. Such a finding can lead to the indefinite admission of the subject to a state mental health institute. It is the plaintiffs' contention that the standards found in Sections 229.1 and 229.9 for temporary detention, admission, and commitment of subjects are violative of substantive due process. The Court agrees.

The primary defect of the Chapter 229 standards is a failure to condition involuntary confinement upon a showing of any type of dangerousness. As the United States Supreme Court stated in *O'Connor v. Donaldson,* 422 U.S. at 575–76, 95 S.Ct. at 2493–2494, 45 L.Ed.2d at 406–407:

> A finding of "mental illness" alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the "mentally ill" can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.
>
> May the State confine the mentally ill merely to ensure them a living standard superior to that they enjoy in the private community? That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends. See *Shelton v. Tucker,* 364 U.S. 479, 488–490 [81 S.Ct. 247, 252–253, 5 L.Ed.2d 231].
>
> May the State fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different? One might as well ask if the State, to avoid public unease, could incarcerate all who are physically unattractive or socially eccentric. Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty. See, *e. g., Cohen v. California,* 403 U.S. 15, 24–26 [91 S.Ct. 1780, 1787–1789, 29 L.Ed.2d 284]; *Coates v. City of Cincinnati,* 402 U.S. 611, 615 [91 S.Ct. 1686, 1689, 29 L.Ed.2d 214]; *Street v. New York,* 394 U.S. 576, 592 [89 S.Ct. 1354, 1365–1366, 22 L.Ed.2d 572]; cf. *U.S. Dept. of Agriculture v. Moreno,* 413 U.S. 528, 534 [93 S.Ct. 2821, 2825–2826, 37 L.Ed.2d 782].
>
> In short, a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.

This clear thrust of *O'Connor* was recently reiterated in *Doremus v. Farrell,* a three-judge court ruling on the constitutionality of Nebraska's civil commitment statutes. That court held:

> To permit involuntary commitment upon a finding of "mental illness" and the need for treatment alone would be tantamount to condoning the State's commitment of persons deemed socially undesirable for the purpose of indoctrination or conforming the individual's beliefs to the beliefs of the State. Due process and equal protection require that the standards for commitment must be (a) that the person

is mentally ill and poses a serious threat of substantial harm to himself or to others; and (b) that this threat of harm has been evidenced by a recent overt act or threat. The threat of harm to oneself may be through neglect or inability to care for oneself.

We are unable to imply these standards in the Nebraska statutes as did the Supreme Court in the Wisconsin statutes construed in *Humphrey v. Cady* [405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394], *supra*, given its references in Section 83–306(4) to the mentally ill as "persons suffering from any type of mental illness whatsoever."

407 F.Supp. at 514–15.

The Court finds the statements of *Doremus* to be fully applicable to the loose standards of § 229.1 and § 229.9. Indeed, there appears to be no difference whatsoever between the definitions of "mental illness" employed by the Iowa and Nebraska statutes. Under these circumstances, and where commitment is possible *solely* on a finding of mental illness (with some rather general references to the interests of the subject), the substantive threshold for allowing commitment under Chapter 229 is simply too low. *See generally* Bezanson, *Involuntary Treatment of the Mentally Ill in Iowa; The 1976 Legislation,* 61 Iowa L.Rev. 261, 278–84 (1975). This Court therefore holds that the commitment standards of Chapter 229 of the Code violated substantive due process by not requiring that subjects pose a serious threat to themselves or others, as evidenced by a recent overt act, attempt or threat. The Court is unable to find this standard present in Chapter 229 by implication, and, indeed the Polk County defendants have admitted that pursuant to their usual procedure, no such finding was required.

### B. VAGUENESS

In addition to attacking the substantive sufficiency of the commitment standards of Chapter 229, plaintiffs assert that those standards are also fatally vague and overbroad.

A statute may be invalidated as impermissibly vague as a result of one or both of the following deficiencies, as enunciated by the Supreme Court: (1) failure to give fair warning of the conduct proscribed by law, and (2) absence of standards restricting the discretion of governmental authorities or courts who apply the law. *See, e. g., Papachristou v. City of Jacksonville,* 405 U.S. 156, 165–70, 92 S.Ct. 839, 845–847, 31 L.Ed.2d 110, 117–20 (1972); *Giaccio v. Pennsylvania,* 382 U.S. 399, 402–03, 86 S.Ct. 518, 520–21, 15 L.Ed.2d 447, 449–50 (1966); *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). While the vagueness doctrine has been employed most often in challenges to criminal statutes, civil statutes have also been subject to vagueness challenges. *See, Giaccio v. Pennsylvania, supra; A. B. Small Co. v. American Sugar Ref. Co.,* 267 U.S. 233, 239–42, 45 S.Ct. 295, 297–98, 69 L.Ed. 589, 593–94 (1925); *Alsager v. District Court of Polk County, Iowa,* 406 F.Supp. 10 (S.D.Iowa 1975). A review of the Iowa standard of commitment in light of the factors enunciated by the Supreme Court reveals that the Iowa statute is unconstitutionally vague.

Plaintiffs assert that the first deficiency in the Iowa law results from a failure to give adequate warning of the conduct proscribed by law. The commitment standards of "mental illness" and "in the best interests" of the individual do not fairly advise the average individual of what conduct will cause the state to interfere with his or her enjoyment of liberty. In the civil commitment context, however, a subject is confined involuntarily in an institution as a result of a status, that of being "mentally ill." The subject is not confined as a result of any particular acts he or she may have performed, though the status of the subject, the mental illness, may have been evidenced by the person's actions. In a situation such as this where the statute premises its operation on an unalterable characteristic of an individual rather than his or her future conduct, the Supreme Court has held that the rationale of the vagueness doctrine requirement of adequate notice does not ap-

ply. *See Boutilier v. Immigration and Naturalization Service*, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967). Therefore, even though Chapter 229 of the Code may not have provided adequate warning, it would not appear to be unconstitutional in the civil commitment context where identification for purposes of treatment and prevention of danger to society are the primary goals, not deterrence of undesirable conduct.

The Iowa civil commitment statute is vulnerable to challenge, however, because it allows the county commissions of hospitalization too much discretion in determining what constitutes mental illness and what is in the subject's "best interest." The Supreme Court in *Papachristou v. City of Jacksonville, supra,* struck down a vagrancy ordinance as void for vagueness because in the absence of standards, it provided the law enforcement officers an opportunity for "arbitrary and discriminatory enforcement." 405 U.S. at 156, 92 S.Ct. at 839, 31 L.Ed.2d at 110. The imprecise commitment standards of the Code create a similar opportunity for arbitrary and discriminatory application; the commitment laws can be applied to people who are merely annoying or bothersome to the decision-makers. *See, e. g., In re Sealy,* 218 So.2d 765 (Fla.App. 1969). (Twenty-six year old man committed for treatment of "chronic schizophrenia" where the only evidence of "mental illness" was lifestyle characterized by the appellate court as that of a "typical hippie.") Under Chapter 229, each commission

member could determine subjectively, on an ad hoc basis, whether a person was "mentally ill" and what was the "best interest" of the individual. The possibility of arbitrary application of the law was especially likely in the civil commitment decision, where legal commentators emphasize the inherent subjectivity of psychiatric diagnosis [6] and critics argue that mental illness is no more than a label placed on behavior which is annoying, burdensome, or frightening.[7] The Court therefore finds that the commitment standards of Chapter 229 are unconstitutionally vague in the absence of standards restricting the discretionary authority of the commission members.[8]

## C. LEAST RESTRICTIVE ALTERNATIVES

Plaintiffs final due process contention is that the State is obligated, upon a determination that confinement of the subject is necessary, to employ methods regarding subsequent detention which are least restrictive of the subject's constitutional rights. The impetus for this argument is the claim that while commitments or admissions can be ordered in a variety of state institutions, *see* § 229.9, § 229.20, and § 229.21 of the Code, there is no provision for less than full-time hospitalization. Indeed, defendants have admitted that while outpatient facilities are available in Polk County, the practice of the commission is never to utilize such facilities, based on the belief that they have no power to do so.[9]

---

**6.** *See, e. g.,* Livermore, Malmquist and Meehl, *On the Justifications for Civil Commitment,* 117 U.Pa.L.Rev. 75 (1968) ("the diagnostician has the ability to shoehorn into the mentally diseased class almost any person he wishes"); Roth, Dayley & Lerner, *Into the Abyss: Psychiatric Reliability and Emergency Commitment Statutes,* 13 Santa Clara Law 400, 400–11 (1973); Note, *A New Emancipation: Toward an End to Involuntary Civil Commitments,* 48 Notre Dame Law 1334 (1974); . . . ..

**7.** Albers, *Involuntary Hospitalization: Observations on the Politics of a Coalition,* 18 S.D.L. Rev. 348 (1973): Livermore, *supra,* Note, at 182; Roth, Dayley & Lerner, Note, at 407; Szasz, *A Psychiatrist Views Mental Health Legislation,* 9 Washb.L.J. 224 (1970).

**8.** Under the present state of the record, the Court can go no farther than to rule on the statute's vagueness on its face. The parties strenuously contest whether a permissible *application* of Chapter 229 was made in the Stamuses' instances.

**9.** The general practice of the various county hospitalization commissions to either admit or commit subjects on a full-time basis or not at all has been documented in the Iowa Law Review, *Contemporary Studies Project: Facts and Fallacies about Iowa Civil Commitment,* 55 Iowa L.Rev. 875, 923–27 (1970).

The matter of least restrictive alternatives in the civil commitment context was considered in *Welsch v. Likins*, 373 F.Supp. 487, 501–02 (D.Minn.1974), where it was noted that there has been a widespread "acceptance by the courts of a constitutional duty on the part of State officials to explore and provide the least stringent practicable alternatives to confinement of noncriminals." No such exploration is mandated by Chapter 229 of the 1975 Code; further, less drastic alternatives than full-time hospitalization have not been explored by the defendant officials in past commitment cases. The Code is violative of due process in this regard, both on its face and as applied in Polk County.

## CONCLUSIONS

To summarize, the present state of the record in this case is sufficiently clear to allow the entry of a declaratory judgment as to the constitutionality of certain aspects of Chapter 229 of the 1975 Iowa Code, as well as certain practices employed by the defendant Polk County officials in this case. Because the Court has consulted undisputed matters of discovery which go beyond the pleadings of the case, plaintiffs' motion for judgment on the pleadings will be denied, and their motion for partial summary judgment sustained. It is the Court's conclusion that Chapter 229 of the 1975 Code is unconstitutional in the following respects pertinent to this case, both on its face and as applied to the plaintiffs:

1. In failing to provide for any type of notice or hearing as to the probable cause for detention of involuntary subjects pending a full commission hearing.

2. In failing to provide adequate notice to detained subjects prior to the full hearing before the commission.

3. In failing to provide for the presence of subjects for the duration of the commission hearing.

4. In failing to provide excluded subjects with the right to participate in their hearing.

5. In failing to advise subjects of their rights to representation of counsel at all significant stages of the proceedings, and in failing to provide that counsel be procured at such a time that representation can be meaningful.

6. In failing to employ a standard of clear and convincing evidence at the full hearing.

7. In failing to require a showing of dangerousness as a prerequisite to involuntary admission and commitment.

8. In failing to employ a sufficiently precise standard upon which admission or commitment can be based.

9. In failing to require that less restrictive alternatives be considered prior to ordering full-time hospitalization.

Accordingly, IT IS HEREBY DECLARED that Chapter 229 of the 1975 Iowa Code is unconstitutional, both on its face and as applied, in the nine particulars just enumerated.

IT IS FURTHER ORDERED that plaintiffs' motion for partial summary judgment is sustained to the extent of the declaratory judgment entered herein. All other motions in this case are overruled.