Markman, J.
(concurring in the result only). We granted leave to appeal to address the proper interpretation of the second sentence of MCL 600.2912a(2), which states: “In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. ” Chief Justice TAYLOR’S opinion concludes that this sentence is “substantially incomprehensible,” and, therefore, “unenforceable.” Ante at 147, 161, 164. Although this statutory language is by no means a model of clarity, I am in accord with Justice CAVANAGH’s opinion that the “lost opportunity” provision is enforceable. *186 However, Justice CAVANAGH concludes that the “lost opportunity” provision requires only that the patient’s premalpractice chance to survive or obtain a better result be greater than 50 percent. Finally, he concludes that this is not even a “lost opportunity” case. In these respects, I also disagree with his opinion.
Instead, I conclude that a “lost opportunity” case is one in which it is at least possible that the bad outcome would have occurred even if the patient had received proper treatment. By contrast, if there is no question that the proper treatment would have resulted in a good outcome, then the patient who has suffered a bad outcome has a traditional medical-malpractice action. In order for a traditional medical-malpractice plaintiff to prevail, he or she must prove that the bad outcome was more probably than not caused by the defendant’s malpractice. In order for a “lost opportunity” plaintiff to prevail, he or she must prove that the “lost opportunity” to achieve a better result was more probably than not caused by the defendant’s malpractice and that the “lost opportunity” was greater than 50 percent. In order to determine whether the “lost opportunity” was greater than 50 percent, the postmalpractice chance of obtaining a better result must be subtracted from the premalpractice chance, the postmalpractice chance must then be subtracted from 100, the former number must be divided by the latter number, and then this quotient must be multiplied by 100 to obtain a percentage. If this percentage is greater than 50, the plaintiff may be able to prevail; if this percentage is 50 or less, then the plaintiff cannot prevail.
Because it is possible that the bad outcome in the instant case, i.e., amputation, would have occurred even if plaintiff had received proper treatment, given that there was some chance of amputation in the latter circum *187 stance, this is a “lost opportunity” action. Because plaintiffs “lost opportunity” was greater than 50 percent,[1] I would affirm the result reached by the. Court of Appeals.
I. “LOST OPPORTUNITY”
A. COMMON LAW
This Court first recognized a “lost opportunity” claim in Falcon v Mem Hosp, 436 Mich 443; 462 NW2d 44 (1990). In Falcon, the plaintiffs expert witness testified that had the defendant physician not been negligent, the plaintiffs decedent would have had a 37.5 percent chance of surviving. Before Falcon, plaintiffs claiming medical malpractice were required to prove that the malpractice in fact caused the patient’s physical harm. Falcon, 436 Mich at 448-449 (LEVIN, J.). Thus, in a wrongful-death case grounded in medical malpractice, the plaintiff was required to prove that the malpractice in fact caused the patient’s death. In Falcon, the defendants argued that because the patient’s premalpractice chance of survival was only 37.5 percent, the plaintiff could not prove that the malpractice caused the patient’s death; the patient might very well have died even with proper treatment.
Although this Court agreed with the defendants that the plaintiff could not prove that the malpractice caused the patient’s death, it nonetheless held that the plaintiff could prove that the malpractice caused the patient to suffer the loss of a 37.5 percent opportunity to survive. Id. at 460. “In reducing [the patient’s] opportunity of living. . ., her physician caused her harm, although it cannot be said . . . that he caused her death.” Id. “We *188 thus see the injury resulting from medical malpractice as not only, or necessarily, physical harm, but also as including the loss of opportunity of avoiding physical harm” because a “patient goes to a physician precisely to improve his opportunities of avoiding, ameliorating, or reducing physical harm . ...” Id. at 461. Thus, we recognized a “loss of an opportunity for a more favorable result, as distinguished from the unfavorable result [itself], as compensable in medical malpractice actions.” Id.[2] “Under this approach, damages are recoverable for the loss of opportunity although the opportunity lost was less than even, and thus it is not more probable than not that the unfavorable result would or could have been avoided.” Id. at 461-462.[3]
*189 However, even “[u]nder this approach, the plaintiff must establish more-probable-than-not causation.” Id. at 462. That is, the plaintiff “must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm.” Id. Therefore, in both a traditional medical-malpractice action, in which the alleged injuiy is the physical injury itself, and a “lost opportunity” action, in which the alleged injury is the “lost opportunity” to achieve a better result, the plaintiff must prove that it is more probable than not that the defendant’s malpractice caused the injuiy. In other words, the difference between these two causes of action is not the standard of proof for causation, but the nature of the alleged injury.
This Court also held that the “lost opportunity” must be a “substantial” lost opportunity. Id. at 470. However, this Court did not define the parameters of a “substantial” lost opportunity other than to say that the “loss of a 37.5 percent opportunity of living constitutes a loss of a substantial opportunity of avoiding physical harm.” Id[4] This Court explained that a “37.5 percent opportunity of living is hardly the kind of opportunity that any of us would willingly allow our health care providers to ignore.” Id. at 460.[5]
*190 Finally, this Court held that “recovery should be allowed ‘only for the lost chance of survival.’ ” Id. at 471 (citation omitted) (emphasis in original). That is, the “ ‘proper computation of damages would limit the damages recoverable to only that amount of reduced chance of recovery actually caused by the physician’s negligent conduct.’ ” Id. at 472 n 47 (citation omitted). Therefore, we concluded that if the jury were to find that the physician’s malpractice more probably than not had caused the patient to lose a 37.5 percent opportunity to survive, “37.5 percent times the damages recoverable for wrongful death would be an appropriate measure of damages.” Id. at 471.[6]
In Weymers v Khera, 454 Mich 639, 642; 563 NW2d 647 (1997), this Court refused to “recognize a cause of action for the loss of an opportunity to avoid physical *191 harm less than death.”[7] Although Weymers did not overrule Falcon, it clearly disagreed with Falcon[8] and “refuse[d] to extend Falcon.” Id. at 649. In Weymers, the plaintiffs expert testified that “if defendants had given plaintiff proper care she would have had a thirty to forty percent chance of retaining the functioning of her kidneys.” Id. at 644. However, the plaintiff did not receive proper care and her kidneys totally failed, requiring her to undergo a kidney transplant. Because the plaintiffs premalpractice chance to avoid kidney failure was not greater than 50 percent, Weymers held that she could not prove that the malpractice more probably than not caused her kidney failure. The Court refused to recognize a cause of action for the plaintiffs “lost opportunity” to avoid kidney failure.
In doing so, Weymers, in my judgment, mischaracterized the “lost opportunity” doctrine that had been developed in Falcon. Weymers stated: “The antithesis of proximate cause is the doctrine of lost opportunity,” because the “lost opportunity doctrine allows a plaintiff to recover when the defendant’s negligence possibly, i.e., a probability of fifty percent or less, caused the plaintiffs injury.” Id. at 648. Weymers also accused the *192 Falcon Court of “lower[ing] the standard of causation” and “allow[ing] [a plaintiff] to recover without establishing cause in fact.” Id. at 650. Finally, Weymers stated that under the Falcon approach, “the plaintiff must show that there is a substantial possibility that the defendant’s negligence caused his injury,” and, thus, a plaintiff is allowed “to recover for his injury even though it was more likely than not that he would have suffered the injury if the defendant had not been negligent.” Id. at 651.
Although Weymers noted that Falcon had “defined the injury as the loss of opportunity to avoid the harm, i.e., the death, rather than the harm itself,” Weymers failed to recognize the significance of this distinction, as shown by its very next sentence, which stated that Falcon’s approach allows “ ‘a plaintiff [to] receive[] compensation despite the greater probability that he or she would have suffered the injury even if the physician had used due care.’ ” Id. at 651 n 19 (citation omitted). This is further shown by the fact that the Weymers majority believed that it would have to “scrap[]” or “discard” causation in order to “recognize a cause of action for the loss of an opportunity to avoid physical harm less than death.” Id. at 653.
However, as discussed earlier, Falcon did not lower the standard of causation when it adopted the “lost opportunity” doctrine. Falcon, 436 Mich at 462 (LEVIN, J.). Instead, it applied the same standard of causation, i.e., more probable than not, to a new type of injury, i.e., a “lost opportunity” to survive. Id. Falcon specifically held that a plaintiff bringing a “lost opportunity” claim “must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm.” Id. *193 Therefore, Weymers erred when it described the “lost opportunity” doctrine developed in Falcon as lowering the standard of causation.
B. STATUTORY PROVISION
In 1993, three years after Falcon was decided, the Legislature enacted MCL 600.2912a(2), which provides:
In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.
Everybody agrees that this provision was enacted in response to this Court’s decision in Falcon.
In Wickens v Oakwood Healthcare Sys, 465 Mich 53, 62; 631 NW2d 686 (2001), this Court held that “a living plaintiff may not recover for loss of an opportunity to survive on the basis of a decrease in her chances of long-term survival.” The plaintiffs expert testified that the defendants’ negligent one-year delay in diagnosing her breast cancer had caused plaintiff to suffer a reduction in her chances of surviving another 10 years. This Court relied on the first sentence of MCL 600.2912a(2), which states that a medical-malpractice plaintiff “has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant.” (Emphasis added.) We held that this provision “expressly limits recovery to injuries that have already been suffered and more probably than not were caused by the defendant’s malpractice.” Wickens, 465 Mich at 60. “Thus, plaintiff can only recover for a present *194 injury not for a potential future injury.” Id.[9] Because the plaintiff in Wickens survived, she had not suffered a loss of an opportunity to survive. Id. That is, a person who survives cannot be said to have suffered a loss of an opportunity to survive. A person does not suffer a loss of an opportunity to survive until that person ceases to survive. Although we held that the surviving plaintiff in Wickens could not bring a claim for a loss of an opportunity to survive, this Court did hold that the plaintiffs claims that the delayed diagnosis resulted in the “need for more invasive medical treatments, emotional trauma, and pain and suffering” could proceed because she had already suffered those injuries. Id. at 61.
In Fulton v William Beaumont Hosp, 253 Mich App 70, 77-78; 655 NW2d 569 (2002), the Court of Appeals described the issue as
whether the second sentence of [MCL 600.2912a(2)] requires a plaintiff in order to recover for loss of an opportunity to survive to show only that the initial opportunity to survive before the alleged malpractice was greater than fifty percent, as argued by plaintiff, or, instead, that the opportunity to survive was reduced by greater than fifty percent because of the alleged malpractice, as argued by defendants.
The Court held that the language “the opportunity” was ambiguous, because it could be referring to the “initial opportunity” or it could be referring to the “loss of opportunity.” Id. at 80. However, because the Court believed that “MCL 600.2912a(2) was enacted to codify and increase the requirements [set forth in Falcon] for *195 what constitutes a ‘substantial loss of opportunity,’ ” id. at 82, quoting Falcon, 436 Mich at 470, and because Falcon “did not focus on the initial opportunity to survive, but focused on whether the decrease in the decedent’s opportunity to survive was substantial,” Fulton, 253 Mich App at 81, the Court chose the latter interpretation, id. at 83. That is, the Court held that the “lost opportunity,” not just the initial opportunity, must “exceed 50 percent.” Id.
I agree with this. The second sentence of MCL 600.2912a(2) reads: “In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%. ” (Emphasis added.) This sentence first refers to the “loss of an opportunity” and then to “the opportunity.” In my judgment, the language “the opportunity” clearly refers back to the “loss of an opportunity.” Therefore, the second sentence can reasonably be read to mean that the loss of the opportunity must be greater than 50 percent. In contrast, there is no reasonable means of reading the language “initial opportunity” into the sentence. Therefore, I agree with Fulton’s conclusion that the lost opportunity, not just the initial opportunity, must be greater than 50 percent.[10]
*196 The Court of Appeals in Fulton next concluded that because the plaintiffs premalpractice chance of survival was 85 percent and her postmalpractice chance of survival was 60 percent to 65 percent, her “lost opportunity” was 20 percent to 25 percent and, thus, because the plaintiffs “lost opportunity” was not greater than 50 percent, she could not recover under MCL 600.2912a(2). However, Fulton did not offer any explanation as to why it merely subtracted the postmalpractice chance from the premalpractice chance to determine the “lost opportunity.” This might have been the correct method of determining the “lost opportunity” if MCL 600.2912a(2) required that such a loss be “greater than 50 percentage points.” However, MCL 600.2912a(2) requires that the “lost opportunity” be “greater than 50%. ” There is a significant distinction between 50 percentage points and 50 percent. As Dr. Roy Waddell, a board-certified orthopedic surgeon in Grand Rapids, has explained: “A decrease in survival rate from 50 percent to 10 percent is a 40-percentage-point decrease, but it is an 80 percent decrease.” Wad-dell, A doctor’s view of “opportunity to survive”: Fulton’s assumptions and math are wrong, 86 Mich B J 32, 33 (March 2007) (emphasis in original). Similarly, a reduction in wages from $5 an hour to $1 an hour is not a 4 percent reduction in wages; rather, it is an 80 percent reduction in wages. See amicus curiae brief on behalf of Dr. Roy W Waddell, pp 12-13.[11]
*197 The other problem with Fulton’s method of calculating the “lost opportunity” is that it does not differentiate between those patients who would have survived regardless of whether they received proper or improper treatment and those patients who needed the proper treatment in order to survive.[12] Such a differentiation is necessary because only those in the latter group have truly suffered a “lost opportunity” as a result of the improper treatment. That is, if a patient would have survived regardless of whether he received proper or improper treatment, the improper treatment cannot be said to have caused him to lose an opportunity to survive. On the other hand, if the patient would have survived only if he had received the proper treatment, the improper treatment can be said to have caused him to lose an opportunity to survive. MCL 600.2912a(2) requires us to determine whether the patient more likely than not fell into the latter category rather than the former category, because the statute only allows a plaintiff to recover for a “loss of an opportunity” that was “greater than 50%” and that was “caused by the negligence of the defendant.. . .” Dr. Waddell’s calculation does just that:
(Premalpractice chance)[13] - (Postmalpractice chance)[14] 100 - (Postmalpractice chance)
*198 The quotient resulting from this numerator and denominator is then multiplied by 100 to obtain a percentage.[15] This number must be “greater than 50%” in order to satisfy the requirement of the second sentence of MCL 600.2912a(2). For instance, if the patient’s pre *199 malpractice chance to achieve a better result was 80 percent and, as a result of the defendant’s malpractice, the patient’s postmalpractice chance is reduced to 20 percent, the patient has suffered a 75 percent loss of an opportunity to survive.[16]
What the Waddell formula essentially does is test the sufficiency of the expert testimony, which is typically presented in the form of two statistics: the likelihood that a patient would have had a good outcome with proper treatment (the “treated survival rate”) and the likelihood that a patient would have had a good outcome with negligent treatment (the “untreated survival rate”). The Waddell formula allows a court analyzing this data to determine whether the plaintiff, when the patient has experienced a bad outcome, has created a question of material fact concerning whether proper treatment more likely than not would have made a difference. The formula does this by identifying the universe of patients who would have had a bad outcome (the denominator) and the subset of those patients who could have been favorably treated (the numerator).
It is easiest to start with the formula’s denominator. This denominator consists of the universe of all patients who would have had a bad outcome, for whatever reason. This group includes two subsets of patients: those who would have had a bad outcome because they received negligent treatment, and those who would have had a bad outcome despite receiving proper treatment. The formula identifies this group by subtracting from 100 the percentage of patients who would have had a good outcome even without proper treatment; in other words, it subtracts the “untreated survival rate” *200 from 100. In this way, a court can take the expert’s statistics and identify those patients who were not treated properly and who experienced a bad outcome. A patient who is the subject of a medical-malpractice action is a member of this group. But we cannot determine whether the patient is a member of this group because he or she was denied the proper treatment or because he or she would have suffered a bad outcome even with proper treatment.
One more calculation must then be made in order to answer the dispositive question posed by the statute: whether it is more likely than not that the patient would have benefited from proper treatment or, put another way, whether the “opportunity to survive or . . . to achieve a better result” was “greater than 50%.” MCL 600.2912a(2). A court has to determine what percentage of those patients with a bad outcome (those patients in the denominator) would have benefited from treatment. This brings us to the Waddell formula’s numerator. The numerator consists of those patients who would have had a bad outcome only if they had been negligently treated. It is calculated by subtracting the “untreated survival rate” from the “treated survival rate,” thus identifying those patients who required treatment to avoid a bad outcome.
Once the numerator and denominator have been calculated, comparison of these two numbers by their quotient allows a court to reasonably determine whether improper treatment more likely than not made a difference in the patient’s outcome. If the number of patients who would have had a bad outcome only if they had been negligently treated (the numerator) comprises more than half of the number of patients who would have had a bad outcome overall (the denominator), then the plaintiff has established that proper treatment *201 more likely than not would have made a difference. In other words, when this has been shown, the plaintiff has created a question of material fact concerning whether the “opportunity”— the benefit that would have been realized by a group of patients from the treatment that was not given to this specific patient — was greater than 50 percent. Such a plaintiff has presented adequate expert testimony to establish a “lost opportunity” cause of action within the meaning of the statute.
As Dr. Waddell has explained:
[T]he intent of the law is to disallow damages unless it can be shown that proper treatment creates a better than even (“greater than 50%”) chance of survival of the patients who would have died without treatment. In other words, if appropriate treatment cannot save at least half of the patients who otherwise would have died, then you do not have sufficient evidence to show that the negligence made the difference in the adverse outcome (death). Conversely, if good treatment can save more than half of the patients who otherwise would have died, then you have adequate evidence that the poor treatment or negligence was likely to blame for the bad outcome. This is exactly what this definition of opportunity measures. [Waddell, 86 Mich B J at 33 (emphasis in original).]
MCL 600.2912a(2) only allows a plaintiff to recover for a “loss of an opportunity” that was “greater than 50%” and that was “caused by the negligence of the defendant ... .” Use of Dr. Waddell’s formula, which generates the actual percentage lost rather than the number of percentage points lost, and excludes those who would have achieved a good result regardless of the malpractice, best ensures, in my judgment, that these statutory requirements are satisfied. That is, this calculation would impose liability, in accordance with MCL 600.2912a(2), in those instances in which the medical *202 care received more likely than not affected whether the patient survived.[17]
II. APPLICATION
Plaintiffs premalpractice chance to obtain a better result was 99 percent, and his postmalpractice chance of obtaining a better result was 95 percent. Pursuant to the Waddell calculation, plaintiff lost an 80 percent opportunity to achieve a better result:
99-95 100 - 95 x 100=80%
Therefore, plaintiffs “lost opportunity” was “greater than 50%. ” Accordingly, plaintiff satisfied the requirements of MCL 600.2912(a)(2). Therefore, I would affirm the result of the Court of Appeals judgment.[18]
*203 III. RESPONSE TO CHIEF JUSTICE TAYLOR
Chief Justice Taylor’s opinion concludes that the second sentence of MCL 600.2912a(2) is “substantially incomprehensible,” and, therefore, “unenforceable.” Ante at 147, 161, 164.[19] Although he does not expressly rely on the “void for vagueness” doctrine, he is apparently doing just that, because I am unaware of any other doctrine that would allow a court to conclude that a statutory provision is “unenforceable” on the basis that it is “substantially incomprehensible.” The enactments of the Legislature are, as a rule, enforceable in the courts of this state absent a violation of the Michigan or the United States constitutions.
The “void for vagueness” doctrine derives from the Due Process Clause. “ ‘It is a basic principle of due process that an enactment is void for vagueness if its *204 prohibitions are not clearly defined.’ ” People v Howell, 396 Mich 16, 20 n 4; 238 NW2d 148 (1976), quoting Groyned, v City of Rockford, 408 US 104, 108; 92 S Ct 2294; 33 L Ed 2d 222 (1972). “The void-for-vagueness doctrine reflects the principle that ‘a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning.. . violates the first essential of due process of law.’ ” Roberts v United States Jaycees, 468 US 609, 629; 104 S Ct 3244; 82 L Ed 2d 462 (1984), quoting Connally v Gen Constr Co, 269 US 385, 391; 46 S Ct 126; 70 L Ed 2d 322 (1926). However,
“this prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for ‘[in] most English words and phrases there lurk uncertainties.’ Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden.” [People v Petrella, 424 Mich 221, 255; 380 NW2d 11 (1985) (citations omitted).]
The “void for vagueness” doctrine serves three related interests:
“First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to he prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective *205 basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute ‘abut[s] upon sensitive areas of basic First Amendment freedoms,’ it ‘operates to inhibit the exercise of [those] freedoms.’ ” [Howell, 396 Mich at 20 n 4, quoting Groyned, 408 US at 108-109.]
I would add that the “void for vagueness” doctrine also ensures that the “judicial power” of this state, see Const 1963, art 6, § 1, is not inappropriately exercised by “interpreting” a statute whose language is simply not susceptible to reasonable interpretation; an attempt to give meaning to such a statute will inevitably devolve into a legislative or policy-making determination on the part of a branch of government whose responsibilities do not entail such determinations.
The “void for vagueness” doctrine has generally been held applicable only to criminal statutes or to laws infringing First Amendment freedoms. Indeed, to the best of my knowledge, this Court has never struck down a civil statute that does not implicate First Amendment freedoms under the “void for vagueness” doctrine. Chief Justice TAYLOR’S opinion cites no Michigan or federal caselaw to the contrary. Nor can any support for his conclusion be found in any of the parties’ briefs or the numerous amicus curiae briefs filed in this Court. Indeed, not one of those briefs even suggests that the “lost opportunity” provision in MCL 600.2912a(2) is unconstitutionally vague.
This Court has held that a
statute may he challenged for vagueness on the grounds that it
—is overbroad, impinging on First Amendment freedoms, or
—does not provide fair notice of the conduct proscribed, or
*206 —is so indefinite that it confers unstructured and unlimited discretion on the trier of fact to determine whether an offense has been committed. [Woll v Attorney General, 409 Mich 500, 533; 297 NW2d 578 (1980).]
Chief Justice Taylor’s opinion does not indicate on which of these grounds it finds the “lost opportunity” provision to be unconstitutionally vague. The first ground certainly is not pertinent, because the “lost opportunity” provision does not impinge on any First Amendment freedoms. Neither of the other two grounds seems to be pertinent either, as both seem to pertain to criminal offenses, given that the second ground refers to “the conduct proscribed” and the third ground refers to “whether an offense has been committed.” The “lost opportunity” provision neither “proscribe[s]” conduct nor confers “unlimited discretion on the trier of fact to determine whether an offense has been committed.” Therefore, there does not seem to be any basis under our current case-law to strike down the “lost opportunity” provision as being unconstitutionally vague. Chief Justice TAYLOR should, at the least, explain and justify his extension of this doctrine, which enables this Court to strike down an enactment of the Legislature.
In A B Small Co v American Sugar Refining Co, 267 US 233; 45 S Ct 295; 69 L Ed 589 (1925), the United States Supreme Court held that a buyer could not elude a contract to purchase refined sugar on the basis that the seller was charging an “unjust” or “unreasonable” price in violation of a federal statute, because the federal statute was unconstitutionally vague. It is noteworthy that although American Sugar involved a civil breach-of-contract action, the statutory language invalidated was a criminal statute. However, even putting that aside, the Court held that the provision was unconstitutionally vague because it required people to *207 “conform to a rule or standard which was so vague and indefinite that no one could know what it was.” Id. at 238-239. That is, it was so “indefinite as to be unintelligible ....” Id. at 240. In order for something to be “unintelligible,” it must be “not capable of being understood.” Random House Webster’s College Dictionary (1991). As discussed throughout this opinion, I simply do not believe that the provision at issue is incapable of being understood. MCL 600.2912a(2) may conceivably be unwise or imprudent, it could conceivably have been drafted with greater clarity and precision, and its interpretation may require an unusual investment of judicial effort, but it is not incapable of being understood.
In Exxon Corp v Busbee, 644 F2d 1030, 1031 (CA 5, 1981), the United States Court of Appeals for the Fifth Circuit held that a state commercial regulatory statute was not unconstitutionally vague, because it was not “ ‘impossible to divine.’ ” (Citation omitted.) That court explained that “[b]ecause the statute is not concerned with either the first amendment or the definition of criminal conduct,... we must be lenient in evaluating its constitutionality.” Id. at 1033. It further explained that “uncertainty in this statute is not enough for it to be unconstitutionally vague; rather, it must be substantially incomprehensible.” Id. (emphasis added).[20] Finally, the court indicated that “the parties themselves have offered possible interpretations” of the provision, and then concluded that “[t]hese attempts at statutory construction illustrate that [the provision] is, while most assuredly not a ‘model of clarity,’ at least amenable to some sensible construction.” Id. at 1034 (cita *208 tion omitted). Because I conclude that the “lost opportunity” provision at issue in the instant case is likewise “amenable to some sensible construction,” I strongly disagree with Chief Justice TAYLOR’S conclusion that this|provision should be struck down on the grounds of vagueness.
Furthermore, I must emphasize the well-established rule that “this Court will presume that all legislation is constitutional and will attempt to construe legislation so as to preserve its constitutionality[.]” People v Neumayer, 405 Mich 341, 362; 275 NW2d 230 (1979).
No rule of construction is better settled in this country, both upon principle and authority, than that the acts of a state legislature are to be presumed constitutional until the contrary is shown; and it is only when they manifestly infringe some provision of the constitution that they can be declared void for that reason. In cases of doubt, every possible presumption, not clearly inconsistent with the language and the subject matter, is to be made in favor of the constitutionality of the act. [Sears v Cottrell, 5 Mich 251, 259 (1858) (emphasis in original).]
“We are duty bound under the Michigan Constitution to preserve the laws of this state. . . .” People v Bricker, 389 Mich 524, 528; 208 NW2d 172 (1973). Therefore, “courts [must] construe the language of a statute so as to give it effect rather than to nullify it.” Petrella, 424 Mich at 241. “Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.” Cady v Detroit, 289 Mich 499, 505; 286 NW 805 (1939). “We exercise the power to declare a law unconstitutional with extreme caution . . ..” Phillips v Mirac, Inc, 470 Mich 415, 422; 685 NW2d 174 (2004). Therefore, “every statute passed by the Legis *209 lature is presumed to be constitutional, and a reviewing court should find an act invalid only when there is no reasonable interpretation which will sustain it.” State Treasurer v Wilson, 423 Mich 138, 146; 377 NW2d 703 (1985). “Indeed, although the presumption is not conclusive, it is powerful enough to permit even a strained construction when necessary to save constitutionality.” Williams v Hofley Mfg Co, 430 Mich 603, 613; 424 NW2d 278 (1998) (citations omitted); see also Osborn v Charlevoix Circuit Judge, 114 Mich 655, 660; 72 NW 982 (1897) (“There is always a presumption in favor of constitutionality, and this presumption justifies a construction which is rather against the natural interpretation of the language used, if necessary to sustain the law.”).
“[Declaring a statute unconstitutional is ‘ “the gravest and most delicate duty that this Court is called on to perform” ’....” People v Lynch, 410 Mich 343, 352; 301 NW2d 796 (1981) (citation omitted). Although I do not necessarily agree that we are obligated to adopt interpretations that are “strained,” Williams, 430 Mich at 613, or “against the natural... language,” Osborn, 114 Mich at 660, I do not believe that the interpretation of MCL 600.2912a(2) set forth in this opinion comes anywhere close to such boundaries. I simply do not think that Chief Justice Taylor’s opinion sufficiently perseveres to avoid the declaration of unconstitutionality that he apparently reaches.[21]
*210 Chief Justice TAYLOR’S opinion concludes that MCL 600.2912a(2) is unenforceable because the two sentences in that provision are inconsistent with one another. Once again, I disagree. Chief Justice TAYLOR states that under the first sentence of MCL 600.2912a(2), a plaintiff must prove that the defendant’s malpractice caused the injury, while under the second sentence, a plaintiff cannot prove that the defendant’s malpractice caused the injury. What he fails to recognize is that in a “lost opportunity” action, the injury is not the death or the physical harm, but the “lost opportunity” to avoid the death or physical harm,[22] and that a “lost opportunity” plaintiff does have *211 to prove that the defendant’s malpractice more probably than not caused this injury. As we explained in Falcon, 436 Mich at 461 (LEVIN, J.): “We thus see the injury resulting from medical malpractice as not only, or necessarily, physical harm, but also as including the loss of opportunity of avoiding physical harm.” However, even “[u]nder this approach, the plaintiff must establish more-probable-than-not causation.” Id. at 462. That is, the plaintiff “must prove, more probably than not, that the defendant reduced the opportunity of avoiding harm.” Id. Therefore, in both a traditional medical-malpractice action, in which the alleged injury is the death or the physical harm itself, and in a “lost opportunity” action, in which the alleged injury is the “lost opportunity” to avoid the death or the physical harm, the plaintiff must prove that it is more probable than not that the defendant’s malpractice caused the injury.
Contrary to Chief Justice TAYLOR’S contention, then, the two sentences in MCL 600.2912a(2) are not inconsistent. Pursuant to the first sentence, all medical-malpractice plaintiffs must prove that the defendant’s malpractice more probably than not caused the alleged injury. Pursuant to the second sentence, a “lost opportunity” plaintiff must prove that the “lost opportunity” was greater than 50 percent. Therefore, in order to satisfy both sentences, a “lost opportunity” plaintiff must prove that the defendant’s malpractice more probably than not caused the “lost opportunity” and that the “lost opportunity” was greater than 50 percent. There is nothing inconsistent about these sentences.
*212 However, there is something inconsistent about Chief Justice Taylor’s opinion. He concludes that the second sentence of MCL 600.2912a(2) is so “substantially incomprehensible” that it is “unenforceable.” Ante at 147, 161, 164. Yet, despite this conclusion, he repeatedly asserts that when the Legislature enacted the second sentence of MCL 600.2912a(2) it “intended” certain things. See, e.g., ante at 158, where the he states that the Legislature “intended” the “lost opportunity” provision to apply to “ situation [s] in which an injury might have occurred anyway, but in which the defendant’s act or omission hastened or worsened it in such a way that the plaintiff suffered more severe physical injury than he or she would have had the negligence not occurred,” and ante at 162, where he states that “the Legislature intended to retain the traditional proximate-cause requirement in effect before Falcon .... ”[23] If this provision is so vague — indeed of a constitutional dimension, as Chief Justice TAYLOR’S opinion essentially concludes— how can he be so certain what the Legislature intended by it? Either we know what the Legislature intended by this provision or we do not; Chief Justice TAYLOR cannot have it both ways.
IV RESPONSE TO JUSTICE CAVANAGH
In his opinion, Justice CAVANAGH concludes that the second sentence of MCL 600.2912a(2) requires only that the patient’s premalpractice chance to obtain a better result be greater than 50 percent. As explained *213 earlier, I agree with him that the phrase “the opportunity” in MCL 600.2912a(2) refers back to the language “loss of an opportunity.”[24] However, I disagree with his conclusion that “loss of an opportunity” refers to the patient’s premalpractice chance to obtain a better result. Instead, I believe that “loss of an opportunity” clearly refers to the opportunity that the patient actually lost as a consequence of the defendant’s malpractice. MCL 600.2912a(2) states that “the plaintiff cannot recover for loss of an opportunity .. . unless the opportunity was greater than 50%. ” (Emphasis added.) That is, the opportunity that MCL 600.2912a(2) refers to is the “lost opportunity” for which the plaintiff may “recover.” The plaintiff cannot necessarily recover for the entire premalpractice chance to obtain a better result; instead, he or she can only recover for the portion of the premalpractice chance that was actually lost. Justice CAVANAGH’s opinion states that “the opportunity alleged to have been lost must be the premalpractice opportunity.” Ante at 174 (emphasis added). This is plainly incorrect. Instead, the chance alleged to have been lost may be the entire premalpractice chance; however, it may also be only a portion of the premalpractice chance, as in the instant case in which plaintiffs opportunity to obtain a better result was reduced from 99 percent to 95 percent. Justice CAVANAGH seems to recognize this, because he states that “the premalpractice opportunity ... is the opportunity that is lost in some measure . . . .” Ante at 174 (emphasis added). In fact, at one point, he seems to reach the same conclu *214 sion that I do — “a plaintiff cannot recover for the loss of an opportunity unless the opportunity — the premalpractice opportunity that was allegedly lost in some measure — was greater than 50 percent.” Ante at 174 (emphasis in original). That is, the portion of the premalpractice opportunity that was lost must be greater than 50 percent. However, at other points, he states inconsistently that the word “opportunity” refers only to the premalpractice opportunity. Ante at 174.
Justice CAVANAGH’s opinion also contends that “MCL 600.2912a(2) cannot limit recovery for the loss of an opportunity to cases in which the loss was greater than 50 percent, because any plaintiff who satisfied that condition would have a traditional medical-malpractice claim for the death or physical harm itself.” Ante at 175-176. Justice CAVANAGH similarly contends that Dr. Waddell’s “formula would preclude true lost-opportunity plaintiffs from bringing claims and provide medical-malpractice claimants with lost-opportunity causes of action for which they have no need.” Ante at 182-183. These contentions, I believe, are incorrect. For example, in the instant case, although, pursuant to Dr. Waddell’s formula, plaintiff suffered the loss of an 80 percent opportunity to achieve a better result, i.e., no amputation, plaintiff cannot prove that defendants’ malpractice caused the amputation, as he would be required to do in a traditional medical-malpractice action. He cannot prove that defendants’ malpractice caused the amputation because there was at least a 1 percent chance that plaintiff would have suffered an amputation even with proper treatment. However, plaintiff did prove that defendants’ malpractice caused him to suffer the loss of an 80 percent opportunity to achieve a better result, i.e., no amputation. Therefore, contrary to Justice CAVANAGH’s contention, it is possible to have a situation in which the “lost opportunity” *215 exceeds 50 percent, but the plaintiff cannot satisfy the requirements of a traditional medical-malpractice action, and Dr. Waddell’s formula identifies those plaintiffs who cannot satisfy the requirements of a traditional medical-malpractice action but who can satisfy the “lost opportunity” requirements of MCL 600.2912a(2).[25]
*217 In order to satisfy traditional medical-malpractice action requirements, there must be no question that the proper treatment would have resulted in a good outcome (at least with regard to the specific injury suffered by the patient), because if there is any chance that a patient who received proper treatment might nevertheless have suffered the specific bad outcome ultimately suffered by the patient, it cannot be proved that the improper treatment caused the bad outcome. If there is any chance that the proper treatment could have resulted in the bad outcome, the chances of a good outcome with proper treatment and the chances of a good outcome with improper treatment must be compared. That is, under those circumstances, although the plaintiff cannot prove that the defendant’s malpractice caused the bad outcome because the bad outcome might have occurred even with proper treatment, the plaintiff may be able to prove that the defendant’s malpractice increased the patient’s chances of obtaining a bad outcome and, thus, caused him or her to suffer a “lost opportunity” to achieve a better result. This is the only coherent concept of a “lost opportunity” cause of action under MCL 600.2912a(2).[26]
*218 v CONCLUSION
A “lost opportunity” action is one in which it is possible that the bad outcome would have occurred even if the patient had received proper treatment. On the other hand, if there is no question that the proper treatment would have resulted in a good outcome and the patient has suffered a bad outcome, the plaintiff possesses a traditional medical-malpractice action. In order for a traditional medical-malpractice plaintiff to prevail, the plaintiff must prove that the bad outcome was more probably than not caused by the defendant’s malpractice. In order for a “lost opportunity” plaintiff to prevail, the plaintiff must prove that the “lost opportunity” to achieve a better result was more probably than not caused by the defendant’s malpractice and that the “lost opportunity” was greater than 50 percent. In order to determine whether the “lost opportunity” was greater than 50 percent, the postmalpractice chance of obtaining a better result must be subtracted from the premalpractice chance; the postmalpractice chance must then be subtracted from 100; the former number must be divided by the latter number; and then this quotient must be multiplied by 100 to obtain a percentage. The calculation can be summarized as follows:
(Premalpractice chance) - (Postmalpractice chance) x 100 - (Postmalpractice chance)
*219 If this percentage is greater than 50, the plaintiff may be able to prevail; if this percentage is 50 or less, then the plaintiff cannot prevail.
Because it is possible that the bad outcome in this case, i.e., amputation, would have occurred even if plaintiff had received proper treatment, the instant case is a “lost opportunity” action. Because plaintiffs “lost opportunity” was greater than 50 percent, I would affirm the result of the Court of Appeals.

 99 - 95 100 - 95 x 100 = 80%

 Justice Archer signed the lead opinion written by Justice Levin, and Justice Boyle wrote a concurring opinion, which Justice Cavanagh joined, that stated:
I concur in the recognition of “lost opportunity to survive” as injury for which tort law should allow recovery in proportion to the extent of the lost chance of survival, ante, [436 Mich at] 466, provided that the negligence of the defendant more probably than not caused the loss of opportunity. However, I would emphasize that the Court today is called upon to decide the viability of a claim for “lost opportunity” only where the ultimate harm to the victim is death. Thus, any language in the lead opinion suggesting that a similar cause of action might he for a lost opportunity of avoiding lesser physical harm is dicta. [Falcon, 436 Mich at 472-473 (Boyle, J., concurring).]

 “[C]onsider the case in which a doctor negligently fails to diagnose a patient’s cancerous condition until it has become inoperable. Assume further that even with a timely diagnosis the patient would have had only a 30% chance of recovering from the disease and surviving over the long term. There are two ways of handling such a case. Under the traditional approach, this loss of a not-better-than-even chance of recovering from the cancer would not be compensable because it did not appear more likely [than] not that the patient would have survived with proper care.... A more rational approach, however, would allow recovery for the loss of the chance of cure even though the chance was not better than *189 even.... While the plaintiff here could not prove by a preponderance of the evidence that he was denied a cure by the defendant’s negligence, he could show by a preponderance that he was deprived of a 30% chance of a cure.” [Falcon, 436 Mich at 462 n 26, quoting King, Causation, valuation, and chance in personal injury torts involving preexisting conditions and future consequences, 90 Yale L J 1353, 1363-1364 (1981).]

 This Court expressly stated: “We need not now decide what lesser percentage would constitute a substantial loss of opportunity.” Falcon, 436 Mich at 470 (Levin, J.).

 In Falcon, the patient’s premalpractice chance of survival was 37.5 percent. The Court did not indicate what the patient’s postmalpractice *190 chance of survival was. It appears that the Court may simply have assumed, erroneously, that the patient’s postmalpractice chance of survival was zero percent, given that the patient died. However, because somebody dies does not mean that the person had a zero percent chance of survival.

 As Professor King has explained:
A better method of valuation would measure a compensable chance as the percentage probability by which the defendant’s tortious conduct diminished the likelihood of achieving some more favorable outcome....
To illustrate, consider a patient who suffers a heart attack and dies as a result. Assume that the defendant-physician negligently misdiagnosed the patient’s condition, but that the patient would have had only a 40% chance of survival even with a timely diagnosis and proper care. Regardless of whether it could be said that the defendant caused the decedent’s death, he caused the loss of a chance, and that chance-interest should be completely redressed in its own right. Under the proposed rule, the plaintiffs compensation for the loss of the victim’s chance of surviving the heart attack would be 40% of the compensable value of the victim’s life had he survived .... [King, 90 Yale L J at 1382.]

 Although Weymers was decided after the Legislature enacted the statutory provision at issue in this case, the Court applied the common law rather than the statute because the alleged negligence occurred before the statute was enacted. It is also worth mentioning that Weymers refused to recognize a common-law claim for a “lost opportunity” to avoid physical harm less than death, although the statute expressly allows those claims. Finally, Weymers stated that “[o]ur Legislature immediately rejected Falcon and the lost opportunity doctrine.” Weymers, 454 Mich at 649. For the reasons discussed later, I do not believe that this is entirely accurate.

 That Weymers disagreed with Falcon explains why Justice Boyle, who concurred in Falcon, only concurred in the result reached in Weymers and why Justice CAVANAGH, who joined Justice Boyle’s concurrence in Falcon, dissented in Weymers. It is also interesting to note that the dissenting justice in Falcon was the authoring justice in Weymers.

 This statutory requirement is consistent with the common law. See, e.g., Henry v Dow Chem Co, 473 Mich 63, 75-76; 701 NW2d 684 (2005) (holding that “a plaintiff must demonstrate a present physical injury to person or property” in order to sustain a negligence claim).

 Contrary to Justice Cavanagh’s contention, I do not believe I am reading words into the statute by concluding that MCL 600.2912a(2), which states that the “lost opportunity” must be greater than 50 percent, means that the patient’s opportunity to achieve a better result “must have been decreased by 50 percent.” Ante at 183-184. If an opportunity has been “lost,” the opportunity has obviously “decreased.” Nor do I “misquot[e]” the statute, as Justice Cavanagh asserts. Ante at 175 n 5.1 am cognizant that the statute states: “the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.” MCL 600.2912a(2) (emphasis added). For the reasons already discussed, I believe that the phrase “the opportunity” obviously refers back to "loss of an opportunity.” In *196 contrast, I believe that Justice Cavanagh is reading words into the statute by concluding that MCL 600.2912a(2) means that the patient’s “initial” chance of obtaining a better result must have been greater than 50 percent when the word “initial” cannot be found anywhere in the statutory provision. That is, while the language “loss of an opportunity” can be found in the statute, the language “initial opportunity” cannot be found in the statute.

 Like the Court of Appeals in Fulton, Justice Cavanagh offers no explanation as to why he repeatedly calculates the “lost opportunity” in *197 terms of the percentage points lost rather than the actual percentage lost when MCL 600.2912a(2) clearly states that the “lost opportunity” must be “greater than 50%,” not greater than 50 percentage points. These statistical concepts are utterly distinct.

 Although I repeatedly refer to a lost “opportunity to survive,” I recognize that MCL 600.2912a(2), unlike Weymers, 454 Mich at 642, also permits a cause of action for a lost “opportunity to achieve a better result.”

 “Premalpractice chance” refers to the patient’s premalpractice chance of survival or chance to achieve a better result. Waddell, 86 Mich B J at 33, refers to this as the “treated survival rate.”

 “Postmalpractice chance” refers to the patient’s postmalpractice chance of survival or chance to achieve a better result. Waddell, 86 Mich B J at 33, refers to this as the “untreated survival rate.”

 Dr. Waddell’s calculation may not be the only conceivable calculation for making the necessary determination under MCL 600.2912a(2), but, in my judgment, it constitutes a reasonable calculation that is in accord with the language of the statute. Moreover, I am cognizant that the Legislature may not specifically have had in mind the concept later embodied in Dr. Waddell’s formula when it enacted MCL 600.2912a(2). However, it is the actual language of a statute to which this Court must ultimately be faithful. People v Schaefer, 473 Mich 418, 430; 703 NW2d 774 (2005) (“When interpreting a statute, it is the court’s duty to give effect to the intent of the Legislature as expressed in the actual language used in the statute.”). The instant case is one in which there is quite likely some disconnection between what the Legislature may have had in mind and what it actually enacted. In the end, though, it is the written law enacted by the Legislature that this Court interprets, not the Legislature’s unstated intentions or the presumed thought processes of individual members of the Legislature.
Justice Cavanagh’s amazement that I can “discern the Legislature’s intent from the statutory language [of MCL 600.2912a(2)],” ante at 183 n 11, is quite remarkable, given that he purports to do exactly the same thing, albeit reaching a different conclusion. Indeed, seeking to discern intent from statutory language is generally what judges do when interpreting the law. He is also determined to make light of the fact that the Legislature could not have had “in mind” when crafting MCL 600.2912a(2) “the concept that was later embodied in Waddell’s formula ...Ante at 183 n 11. Although I recognize that the Legislature may not “specifically [have had] in mind” the concept underlying Dr. Waddell’s formula, in essentially comparing premalpractice and postmalpractice opportunities in terms of percentages rather than percentage points, this formula is an altogether logical and commonsensical way of looking at “loss of opportunity” claims. Nonetheless, the only conclusion I reach in this opinion is that, whatever was in the recesses of Senator A’s or Representative B’s minds in the Legislature, they and their colleagues crafted a statute that is consistent with Dr. Waddell’s formula and inconsistent with Justice Cavanagh’s interpretation.

 80 - 20 100 - 20 x 100 = 75%

 I acknowledge that the Waddell approach appears to lead to anomalous results in those situations in which there is only a slight loss of an opportunity. For example, as defendants point out, if the premalpractice chance of survival was 99.99 percent and the postmalpractice chance was 99.97 percent, the “lost opportunity” would be 66.67 percent. Possibly, this would not constitute a practical problem, because experts are not generally able to predict opportunities with this degree of precision. See, e.g., Falcon, 436 Mich at 449 n 5 (Levin, J.) (“ ‘Human nature being what it is, and the difference between scientific and legal tests for “probability” often creating confusion, for every expert witness who evaluates the lost chance at 49% there is another who estimates it at closer to 51%.’ ”) (citation omitted). Nonetheless, if the Legislature wants to avoid the possibility of such an anomalous result, it could require, for example, that there be a threshold percentage-point loss as a result of the defendant’s malpractice, say 5 or 10 percentage points, in addition to the requirement of the loss being “greater than 50%.” Finally, I would emphasize that I am neither advocating for nor against the Waddell calculation as a matter of fairness or sound public policy; I simply believe that it is in accordance with the Legislature’s directions in MCL 600.2912a(2).

 Although, for the reasons discussed above, I agree with the result reached by the Court of Appeals, I respectfully disagree with its calculation of the “lost opportunity.” In addition, I disagree with its conclusion *203 that all the risks to which the patient was exposed should be considered when determining the patient’s “lost opportunity.” Instead, I believe that only those risks associated with the injuries that the patient actually suffered should be considered, since the whole point of a negligence action is to establish that the defendant’s negligence caused a specific injury. That the negligence could possibly have caused other injuries is just not relevant. Further, only considering the risks associated with the injuries actually suffered is consistent with our decision in Wickens, 465 Mich at 54, 61, in which we held that “a living person may not recover for loss of an opportunity to survive,” because “a loss of opportunity to survive claim only encompasses injuries already suffered....” Therefore, the risk of death cannot be considered when the plaintiff did not actually die.
Moreover, as discussed above, plaintiffs recovery should have been limited to 80 percent of the damages calculated, given that plaintiff suffered the loss of an 80 percent opportunity, not a 100 percent opportunity. However, given that it does not appear that defendants ever raised this issue, I would not remand to the trial court on this basis.

 In similar fashion, his opinion states that MCL 600.2912a(2) “cannot be interpreted as written,” that it “createls] a paradox,” and that the second sentence of the statute “impossibly conflicts” with the first sentence. Ante at 157, 158, 160-161.

 Although Chief Justice Taylor does not expressly state that he believes MCL 600.2912a(2) to be unconstitutionally vague, he uses the identical language — “substantially incomprehensible” — that the Exxon Court used when addressing whether a statutory provision was unconstitutionally vague.

 It is also noteworthy that this Court has repeatedly made it clear that “ambiguity is a finding of last resort,” because a finding of ambiguity
enables an appellate judge to bypass traditional approaches to interpretation and either substitute presumptive “ ‘rule[s] of policy,’ ” see Klapp v United Ins, 468 Mich 459, 474; 663 NW2d 447 (2003), quoting 5 Corbin, Contracts (rev ed, 1998), § 24.27, p 306, or else to engage in a largely subjective and perambulatory reading *210 of “legislative history.” [Lansing Mayor v Pub Service Comm, 470 Mich 154, 164-165 and n 6; 680 NW2d 840 (2004).]
Yet, in this case, Chief Justice Taylor not only concludes that the statute is ambiguous, but essentially concludes that it is unconstitutionally vague and, therefore, null and void.

 Chief Justice Taylor’s opinion contends that pursuant to Wickens, 465 Mich at 60-61, the injury in a “lost opportunity” action must be the death or the physical harm, not the “lost opportunity” to avoid the death or the physical harm. I disagree. In Wickens, this Court simply held that a surviving plaintiff has not lost an opportunity to survive. That is, a surviving plaintiff cannot recover damages for the possibility that he or she may die sometime in the future. There must be a present injury. Therefore, in a “lost opportunity to survive” action, the patient must have failed to survive; and, in a “lost opportunity to achieve a better result” action, the patient must have failed to achieve the better result. Those plaintiffs who survived, and those who achieved the better result, have simply suffered no “lost opportunity” at all, and thus have no grounds on which to seek a recovery. However, those patients who did not survive, and those patients who did not achieve a better result, do have a present injury, even though the plaintiffs in those cases cannot prove that the defendant’s malpractice caused the death or the physical harm, and these plaintiffs can recover as long as they can prove that the defendant’s malpractice caused the patients to lose an opportunity to survive or achieve a better result and that the “lost opportunity” was greater than 50 percent. Contrary to Chief Justice Taylor’s contention, *211 Falcon, 436 Mich at 470 (Levin, J.), did not allow for the recovery of the same kind of injury that Wickens precluded. In Falcon, unlike in Wickens, the patient did not survive and thus did suffer a “lost opportunity to survive.”

 Chief Justice Taylor’s opinion contends that the Legislature intended to s bolish “lost opportunity” claims. I agree with Justice CAVANAGH’s opinion t rat if that was the Legislature’s intent, it would have simply prohibited plaintiffs from bringing “lost opportunity” claims, rather than merely adding a provision that imposes an additional requirement on “lost opportunity” plaintiffs.

 At one point, Justice Cavanagh asserts that the phrase “the opportunity” refers back to the language “loss of an opportunity” and, thus, that they “are to be construed identically,” ante at 174; however, at another point, he asserts that my proposed meaning of “the opportunity” would inappropriately read the words “loss of” into the provision, ante at 174-175. These assertions are simply incompatible.

 Although Justice Cavanagh states that he disagrees with my distinction between a “lost opportunity” action and a traditional medical-malpractice action, at other points in his analysis he seems to agree with it. For instance, he states that a plaintiff would not be able to recover for the patient’s death in a traditional medical-malpractice action if the patient only had a 40 percent premalpractice chance of survival, because the plaintiff “would not be able to prove that the physician’s malpractice more probably than not... caused the patient’s death” since “[t]here was a 60 percent chance that the patient would have died regardless of the malpractice, as a result of the preexisting condition. But the plaintiff might be able to show that the physician’s malpractice more probably than not caused the patient to lose up to a 40 percent chance of avoiding death,” i.e., recover for the “lost opportunity” in a “lost opportunity” action. Ante at 171-172. This is precisely the distinction that I make between “lost opportunity” actions and traditional medical-malpractice actions.
Yet at other points Justice Cavanagh seems to misunderstand my distinction between “lost opportunity” actions and traditional medical-malpractice actions. For instance, he states that my distinction must be wrong because we have long held that the medical malpractice does not have to be the sole cause of the injury in order for a medical-malpractice plaintiff to prevail. Ante at 176 n 6, 179-182. However, my distinction is not inconsistent with this holding. To the contrary, I agree with Justice Cavanagh that the medical malpractice does not have to be the sole cause of the injury. For example, if Bill broke Tom’s leg and Dr. Jones committed medical malpractice in treating Tom’s broken leg, resulting in permanent damage to Tom’s leg, Tom may still be able to prevail in a traditional medical-malpractice action for the permanent damage to his leg. He would be able to prevail in such an action if proper treatment would not have resulted in permanent damage. However, if there was a chance that Tom’s leg would have been permanently damaged even with proper treatment, then Tom would only be able to recover for his “lost opportunity” of avoiding the permanent damage. Contrary to Justice Cavanagh’s contentions, my analysis would not “preclude plaintiffs with *216 preexisting conditions that might have contributed slightly to their injuries from bringing medical-malpractice claims”; it would not “preclude medical-malpractice claims from arising in situations in which proper medical treatment does not always succeed”; and it would not “preclud[e] a medical-malpractice claim unless administering proper treatment would never produce permanent damage.” Ante at 179, 182 n 9 (emphasis in original). Furthermore, I agree with Justice Cavanagh that the “fact that a plaintiff has a preexisting condition does not, by itself, cause a claim to be a lost-opportunity claim rather than a [traditional] medical-malpractice claim.” Ante at 181. As explained above, even though Tom had a pre-existing condition, i.e., a broken leg, Tom would still have a traditional medical-malpractice action if proper treatment would not have resulted in permanent damage.
Finally, Justice Cavanagh concludes that the instant case is not a “lost opportunity” cause of action. Ante at 178. However, this seems to be inconsistent with his own definition of a “lost opportunity” cause of action. He defines a “lost opportunity” action as one in which the “lost opportunity” was not greater than 50 percent. Ante at 171-172 and n 2, 176-177. He calculates this “lost opportunity” by subtracting the post-malpractice chance of obtaining a better result from the premalpractice chance. Ante at 171-172 and n 2, 176-177. In the instant case, the premalpractice chance was 99 percent and the postmalpractice chance was 95 percent. Therefore, pursuant to Justice Cavanagh’s own formula, plaintiffs “lost opportunity” was 4 percent. Given that plaintiffs “lost opportunity” was less than 50 percent, I do not understand why he concludes that this is not a “lost opportunity” cause of action. Further, I do not understand why he believes that this plaintiff should prevail, given his conclusion that MCL 600.2912a(2) simply codified Falcon and added the requirement that the premalpractice chance must be greater than 50 percent. As Justice Cavanagh explains, Falcon held that the “lost opportunity” must be “substantial.” Ante at 168, quoting Falcon, 436 Mich at 470 n 43 (Levin, J.). Does Justice Cavanagh believe that a 4 percent “lost opportunity” is “substantial”? Justice CAVANAGH, ante at 178 n 7, attempts to avoid this dilemma by making the same mistake as the Court of Appeals, i.e., considering all potential risks rather than only those risks associated with the injury actually suffered by plaintiff. See n 18 supra. For example, given that plaintiff did not die, it is inappropriate to take into consideration, as Justice CAVANAGH does, the fact that plaintiffs risk of death increased as a result of the medical malpractice. Id. Contrary to Justice Cavanagh’s contention, not considering plaintiffs increased risk of death does not “penalizeG [plaintiff] for managing to survive,” ante at 178 n 7; it simply does not calculate his entitlement to a recovery in malpractice on the basis of a death that he never suffered. I cannot *217 comprehend why Justice CAVANAGH thinks that considering an increased risk of death is “relevant to the jury’s determination of whether malpractice [has] caused a plaintiff to suffer a particular harm,” ante at 178 n 7 (emphasis added), when the “particular harm” actually suffered was other than death.

 Given that (a) Chief Justice Taylor’s analysis would render the “lost opportunity” provision null and void, (b) Justice CAVANAGH’s analysis is inconsistent and incompatible with the language of the statute, and (c) the analysis in this opinion has no votes other than my own, I urge the Legislature to revisit MCL 600.2912a(2) at its earliest opportunity. If the Legislature wishes to maintain the “lost opportunity” doctrine, it should enact a provision that indicates such an intention, and that sets forth in as clear a manner as possible the requirements a “lost opportunity” plaintiff must satisfy. The fractionalization of this Court in the instant *218 case suggests that this has not been achieved by the present language of MCL 600.2912a(2). It is ironic, as Chief Justice Taylor points out, ante at 164 n 14, that the majority holding in Fulton continues apparently to he the law of our state, despite the fact that not a single justice on this Court agrees with this holding and despite the fact that three justices (those supporting Justice Cavanagh’s opinion), who support the dissent in Fulton, are effectively marshaled in support of this conclusion. Nonetheless, I think that Chief Justice Taylor’s analysis in this regard is correct.